IN RE ESTATE OF GLASS, Deceased: ODEGARD, Personal Representative, Respondent v. BIRKELAND, Appellant.

Supreme Court

*No. 76–060. Submitted on briefs September 7, 1978.—Decided October 3, 1978.*

(Also reported in 270 N.W.2d 386.)

130

For the appellant the cause was submitted on the brief of *William F. Nelson, Kristine A. Euclide* and *Stafford, Rosenbaum, Rieser & Hansen* of Madison.

For the respondent the cause was submitted on the brief of *Fred B. Colman* of Milwaukee.

HANSEN, J.   The testatrix, Hazel O. Glass, was survived by a sister, Celeste Halvorsen; a brother, Glenn Odegard; a nephew, Anders Birkeland, an objector to the will and the appellant; and a nephew, Gordon D. Odegard, the proponent, sole beneficiary and the respondent. The brother and sister joined Birkeland in objecting to the admission of the will to probate, but have not appealed.

Hazel O. Glass, a widow since the mid-1960's, was admitted to the hospital on November 2, 1975. She underwent surgery on November 10, 1975, and died of cancer on November 30, 1975, at the age of seventy-one years.

On December 8, 1975, Gordon D. Odegard, the respondent, petitioned for probate of a will allegedly executed by her on November 4, 1975. He was the sole beneficiary. On January 5, 1976, Birkeland, the appellant, filed an objection to the will alleging that Hazel O. Glass was not of sound mind on November 4th and that the will had been procured by undue influence exerted by the respondent and his wife. The appellant also charged that an earlier will had been removed from Hazel O. Glass' apartment and had not been filed with the court. Appellant filed an amended objection on February 2, 1976, adding that the will was procured through fraud. After a hearing on the objections, an order admitting the will was entered on June 2, 1976.

The evidence presented at trial can be summarized as follows:

The testimony reflects that when Mrs. Glass entered the hospital on November 2nd, there was a prior will in existence which divided her estate between her two nephews. Just prior to the hospitalization either Mrs. Glass or the respondent contacted a lawyer, Paul C. Konnor, regarding the preparation of a new will. Konnor met Mrs. Glass for the first time when he visited her in the hospital on November 3rd to discuss the terms of the new will. The will was prepared and executed on the following day. Konnor and a nurses' aide were witnesses. Konnor testified that he had satisfied himself at the meeting on the 3rd that Mrs. Glass was of sound mind and memory and competent to make a will. The nurses' aide testified that Mrs. Glass was alert and oriented at the signing.

Mrs. Glass lived in Milwaukee. The respondent and his wife were her only relatives in the Milwaukee area and visited her on an almost daily basis while she was in the hospital. The respondent had found a doctor for her and arranged for the hospitalization. During the hospitalization the respondent conferred with the doctor about her progress and the course of treatment. The respondent testified that he and his family had generally visited Mrs. Glass several times a year, but that she had not visited them in their home for several years. Both the respondent and his wife testified that they had a good relationship with Mrs. Glass. They also said she was an independent person who was not easily influenced.

The appellant testified that he had not visited Mrs. Glass in many years and did not come to the hospital although he had been notified of the hospitalization. The appellant did not attend the funeral but testified that he was ill at the time.

Dr. Glenn H. Franke, the attending physcian, testified that Mrs. Glass was seriously ill during her hospitalization with carcinoma that had spread throughout her

abdomen. She also had severe arthritis and vascular disease. He testified that she was alert and oriented up until a couple of days before her death and that she seemed capable of managing her own affairs during the hospitalization.

Mrs. Marie Bolich who had been a very close friend of Mrs. Glass' for about 30 years testified that Mrs. Glass had frequently referred to the respondent and his wife as making her sick because they only visited her when they wanted something. She testified that Alice Odegard, respondent's wife, had called her in the summer of 1975 to ask her to talk to Mrs. Glass about a power of attorney. Mrs. Bolich said when she mentioned it to Mrs. Glass she responded that they just couldn't seem to wait and that she could manage her own affairs. Mrs. Bolich also recalled Mrs. Glass referring to the respondent as a "vulture." She also testified that the way respondent referred to Mrs. Glass as his "favorite aunt" had become a private joke between the two of them. When Mrs. Bolich used the phrase jokingly, Mrs. Glass would reply "I'll bet."

Mrs. Bolich testified that Mrs. Glass was a sweet person who never complained, who avoided conflicts whenever possible, and who found it difficult to say "no" to someone.

On cross-examination in response to a question whether Mrs. Glass was a determined person, Mrs. Bolich replied that she was stubborn. She agreed that Mrs. Glass was independent and able to take care of herself.

Mrs. Bolich testified that she had visited Mrs. Glass four or five times during her hospitalization. She testified that during the first week Mrs. Glass was weak and frightened, but seemed alert and was able to converse. She testified that following surgery Mrs. Glass was still weak and frightened but could no longer carry on a conversation because she would constantly fall asleep.

Mrs. Bolich's testimony was substantially confirmed by her husband's testimony.

Celeste Halvorsen, testified that the respondent called them on November 8th to inform them of her sister's hospitalization and that she, her husband and brother, all residents of Blair, Wisconsin, visited Mrs. Glass the following day. She testified that her sister seemed restless, nervous and depressed and that she was very weak. She testified that she spoke privately with her sister in Norwegian. She said that when she left the hospital room the respondent came up to her and told her that her sister had a will naming herself, her brother and the appellant in it. He then added that Mrs. Glass was hard to convince and stubborn. Mrs. Halvorsen's testimony was substantially confirmed by her husband.

Mrs. Theresa Bubemko, a friend of Mrs. Glass' for over 30 years, testified that Mrs. Glass had told her in the spring of 1975 that she had to change her will and that the respondent would get her money. She said she visited Mrs. Glass on November 8th and that she was alert that day.

Janet Koerber, an associate lawyer of Konnor, testified that she prepared Mrs. Glass' will on November 4th and that Konnor took the will with him when he left the office that evening. In accordance with their office practice, after the will was executed she sent a statement for services to the respondent on November 12, 1975. Mrs. Glass paid it by check on November 21, 1975.

Dr. John Greist, a psychiatrist, testified generally on the psychological stages a dying person goes through. On the basis of his examination of Mrs. Glass' medical records, he testified that she would have been more susceptible to influence than a well person would be. When Mrs. Bolich's testimony regarding Mrs. Glass' personality was read to him to consider, Dr. Greist stated that this submissive personality would be more vulnerable

than the ordinary person during the dying process. On cross-examination, Dr. Griest testified that an independent and strong-willed person would still be more susceptible during the dying process than a well person would be.

The issues on appeal are:

1. Whether the trial court's finding that the will was not procured through undue influence is contrary to the great weight and clear preponderance of the evidence?

2. Whether the trial court abused its discretion in permitting the lawyer's logbook to be admitted into evidence when that logbook was not produced at his deposition but in fact was first produced at trial?

### SUFFICIENCY OF THE EVIDENCE.

In this case the findings of the trial court are based upon conflicting evidence. When such a situation is presented, the test on appeal is whether a judicial mind could, on due consideration of the evidence as a whole, reasonably have reached the same conclusions, *In re Estate of Evans,* 83 Wis.2d 259, 271, 265 N.W.2d 529 (1978). Such findings will not be upset on appeal unless they are against the great weight and clear preponderance of the evidence. *In re Estate of Taylor,* 81 Wis.2d 687, 696, 697, 260 N.W.2d 803 (1978).

On appeal this court will examine the record, not for evidence to support the findings the trial court did not make, but for facts to support the findings the trial court did make. *In Matter of Estate of Becker,* 76 Wis.2d 336, 347, 251 N.W.2d 431 (1977). The evidence which supports a finding need not meet the great weight and clear preponderance test and the fact that evidence exists which would support a contrary finding will not justify

reversal. Reversal is required only if the evidence in support of the contrary finding constitutes the great weight and clear preponderance. *In re Estate of Jones,* 74 Wis.2d 607, 610, 611, 247 N.W.2d 168 (1976).

The credibility of the witnesses and the weight to be given their testimony is a matter for the trial court. *Jones, supra,* at 612. Where conflicting inferences can be drawn from the testimony, the trial court must be assumed to have drawn the inference that supports the findings. *Gehr v. Sheboygan,* 81 Wis.2d 117, 122, 260 N.W.2d 30 (1977).

It is well established that undue influence can be proven in two ways. First, the objector may prove the existence of the following four elements by clear, satisfactory and convincing evidence:

(a) An opportunity to influence;
(b) coveted result;
(c) susceptibility to undue influence; and
(d) a disposition to influence.

Where clear, satisfactory and convincing evidence proves the existence of any three of these elements only slight evidence is necessary to prove the fourth. *Evans, supra,* at 281.

The second method requires the objector to prove the existence of a confidential relationship between the testator and the favored beneficiary and suspicious circumstances surrounding the making of the will.

In deciding whether a confidential relationship existed between the testator and the beneficiary the court will look at:

" '. . . the ease in which a confidant can dictate the contents and control or influence the drafting of such a

will either as the draftsman or in procuring the drafting . . . If one is not the actual draftsman or the procurer of the drafting, the relationship must be such that the testator depends upon the advice of the confidant in relation to the subject matter of the will. . .'" *In re Estate of Kamesar*, 81 Wis.2d 151, 164, 259 N.W.2d 733 (1977).

In *Kamesar* this court defined " 'procure' " to mean " 'to instigate,' " " 'to initiate' " or " 'to cause a thing to be done.' " *Id.* at 165. The court also said that the role of financial advisor can serve as the basis for a confidential relationship. *Id.* The existence of a power of attorney and management of the testator's affairs are also important. *In re Estate of Malnar*, 73 Wis.2d 192, 203, 243 N.W.2d 435 (1976).

The trial court found that no confidential relationship existed between Mrs. Glass and respondent. The court first concluded that the respondent had not procured the will. The court explained that although the respondent made the initial contact with the lawyer, he was not present at the conference the lawyer had with Mrs. Glass regarding the will. The court also concluded that Mrs. Glass had not relied on the respondent's advice regarding the will. The court referred to the testimony which indicated that Mrs. Glass was independent, had refused to give respondent a power of attorney and had signed the check to Konnor herself nine days before her death. The court also observed that the testator had told a friend early in 1975 that the respondent would get her money.

The appellant argues that a confidential relationship existed because the respondent selected the lawyer and told him what the will was to provide, was present at the signing, visited Mrs. Glass daily, took over her financial affairs and agreed with her physician regarding sedation. The evidence to support these assertions is not undisputed.

There is conflicting evidence as to who selected and contacted Konnor. At various points in his testimony

Konnor said that both Mrs. Glass and the respondent had called him first. Konnor did testify that respondent had told him what the will was to contain. But Konnor did confer alone with Mrs. Glass regarding the will. The testimony is conflicting as to whether respondent was present when the will was executed. Konnor said no. The other witness to the will said yes. Respondent said he didn't remember whether he arrived during or after, and his wife stated that they arrived during the signing and were there when Mrs. Glass tore up her former will. The respondent had not personally met Konnor prior to the day the will was executed.

The respondent did select the doctor, conferred with him during the hospitalization and agreed to a course of sedation. He was closing down Mrs. Glass' apartment during her hospitalization. The respondent was the one who contacted the other relatives six days after Mrs. Glass entered the hospital. The previous will was in the respondent's possession. Konnor's bill was sent to the respondent, although Mrs. Glass paid it by check. At trial, respondent testified that he never discussed a power of attorney with Mrs. Glass but at his deposition he stated that she had thought it was a good idea.

The respondent did not draft the will, nor was he the lawyer's only source of information regarding its contents. The day before the will was executed, Mrs. Glass conferred with the lawyer alone regarding its contents. There was certainly no fiduciary relationship between Mrs. Glass and the respondent. No power of attorney was given and respondent's financial role was limited to receiving the lawyer's bill. Respondent clearly was serving as next of kin during the hospitalization, but this role was also limited and was natural considering that he was Mrs. Glass' only blood relative in the Milwaukee area. Although the relationship was close and Mrs. Glass was

somewhat dependent on the respondent for some business and personal dealings during her hospitalization, it can not be said that it was of the type of relationship generally considered "confidential." There is no evidence that Mrs. Glass was looking to respondent for advice or entrusting him with important personal business. The trial court's conclusion is not against the great weight and clear preponderance of the evidence.

Since we are satisfied no confidential relationship existed between the testatrix and the respondent, it is unnecessary to consider the element of suspicious circumstances.

The trial court found that at the time of the making of the will: (1) That Odegard had the opportunity to unduly influence Mrs. Glass; (2) that he was not disposed to unduly influence her; (3) that Hazel O. Glass was not susceptible to being unduly influenced by respondent; and (4) the fact that she left her estate to him was not the result of coveted conduct on his part.

The finding that the respondent had the opportunity to influence Mrs. Glass is not disputed.

A beneficiary has effected a coveted result when the bequest is unnatural or unexpected. *Kamesar, supra,* at 162. However, even a bequest which evidences a drastic change in attitude can be sustained if logical reasons are shown for that change. *Evans, supra,* at 284.

This issue concerns not only the naturalness of the bequest to the respondent, but also the naturalness of the exclusion of the other relatives. The naturalness of a bequest must be detemined from an examination of the surrounding circumstances. *In re Estate of Christen,* 72 Wis.2d 8, 18, 239 N.W.2d 528 (1976).

No other will was admitted into evidence. However, the record contains testimony from which it might be in-

ferred there were possibly two prior testamentary documents. Konnor testified that the respondent's wife brought him a will which his testimony indicates left the estate to the respondent and the appellant. This will was destroyed by the testatrix in her hospital room after she had executed the November 4, 1975, will. Respondent told Celeste Halvorsen, the deceased's sister, that she, her brother and the appellant were mentioned in Mrs. Glass' will. The trial court found this to be an inference that the respondent did not know the contents of the November 4, 1975, will.

Evidence was offered to explain the exclusion of appellant. Konnor testified that Mrs. Glass told him she was changing her will because she hadn't seen appellant in many years. No explanation was given for the exclusion of her sister and brother in either this or the prior will.

Viewing the evidence in the light most favorable to the trial court's finding there is evidence to support the conclusion that the prior will named only the appellant and respondent. There is evidence to explain the appellant's exclusion. There is also evidence that early in 1975, Mrs. Glass said she would have to change her will. There is evidence to show that the relationship between Mrs. Glass and respondent was not unfriendly. The respondent was a blood relative who did assist Mrs. Glass during her illness.

"Thus, where the record shows that a testator was alienated from natural objects of his affection or felt that they had abandoned him in his hour of need, a will may be natural even though it makes no provision for them. . . ." *Evans, supra,* at 284.

The trial court's finding that the will was not the result of coveted conduct (that the will does not achieve a coveted result) is not against the great weight and clear preponderance of the evidence.

The element of susceptibility to undue influence is not to be confused with the question of competency to make a will.

The issue is not whether Mrs. Glass was capable of making a will, but rather whether she would be susceptible to undue influence by a particular person. The distinction was pointed out by Dr. Greist in his testimony. He stated:

". . . the two are, in essence, an apple and an orange. We do not have to have someone be disoriented, psychotic, mentally disturbed to be more susceptible to influence of others. We all know individuals whom we would not consider mentally ill whom we feel are, in a word, pushovers."

Susceptibility is defined as "lack of ability to resist some extraneous agent," "capable of submitting to an action, process, or operation," "open, subject or unresistant to some stimulus, influence or agency." Webster's New Collegiate Dictionary. This court described it as "receptiveness to other's suggestions" in *Estate of McGonigal,* 46 Wis.2d 205, 213, 174 N.W.2d 256 (1970). The court should consider the testator's age, personality, physical and mental health and ability to handle business affairs. *Estate of Hamm,* 67 Wis.2d 279, 288, 289, 227 N.W.2d 34 (1975). Although these same factors are considered in determining competency, the object of the consideration is different. The question is not whether the testator is aware of her property and natural heirs but whether her natural defenses are lowered leaving her unable to resist the suggestions of a stronger, more determined individual.

The trial court here found that evidence showed that Mrs. Glass "was a strong willed lady of independent mind." The court referred to her doctor's testimony that she was alert, well-oriented and capable of managing

her affairs. The court did consider the testimony of the appellant's medical expert and agreed that sick people are more susceptible than well people. However, the court then stated that "sick people are capable of making wills even while under disability." This statement combined with the court's discussion of *Will of Truehl*, 220 Wis. 134, 264 N.W. 254 (1936), a mental capacity case, renders the trial court's finding somewhat suspect.

Susceptibility must be found to exist at the time the influence was being exercised—the time the will was executed. The trial court found that the will was signed on November 4th. Evidence was introduced which would support this conclusion, therefore only evidence regarding Mrs. Glass' condition up to that date is relevant to susceptibility.

The evidence disclosed that Mrs. Glass was seventy-one at the time of her death, she had been a widow since the mid-1960's and lived alone. She handled her own financial affairs. She broke her leg in July, 1975, and was hospitalized for a month. She then spent two weeks in a nursing home. After returning home she continued to suffer the effects of that injury and was unable to care for herself. She was not eating properly and had lost a great deal of weight. Because of this she was admitted to the hospital in November.

Her doctor described her as dreadfully ill at the time of her admission, suffering from severe arthritis and vascular disease as well as cancer. Celeste Halvorsen testified that the last time her sister called her shortly before entering the hospital she complained of being weak and said she would never make it. There is no dispute that Mrs. Glass was alert, oriented and of sound mind the first few days of her hospitalization. The lawyer, doctor and nurses' aide each testified to it. The respondent and his wife testified that she was indepen-

dent, as did her friend, Theresa Bubemko. Marie Bolich agreed, when asked, that Mrs. Glass was an independent person who could take care of herself. However, when asked to describe Mrs. Glass she said she was a sweet person who didn't like to complain, who found it hard to say no, and who avoided personality conflicts. Mrs. Bolich also said that although Mrs. Glass was alert and able to carry on a conversation her first week in the hospital, she was frightened and complained of being very weak and unable to help herself.

It was the duty of the trial judge to weigh the evidence and assess the credibility of the witnesses. Based upon the evidence presented, he could reasonably have found that Hazel O. Glass was not susceptible to undue influence. It appears, however, that the trial court combined the evidence of independence with the evidence of mental alertness and found her competent to make a will instead. Despite this aberrant finding it cannot be said that a finding that Mrs. Glass was not susceptible to undue influence would be against the great weight and clear preponderance of the evidence.

The element of disposition has been defined to mean a willingness to do something wrong or unfair with grasping or overreaching characteristics. *Evans, supra,* at 282.

The trial court concluded that the fact that respondent borrowed money from Mrs. Glass and requested a power of attorney did not show a disposition to influence. The trial court then states that Mrs. Glass' refusal to grant a power of attorney indicated she was the one in control and that the respondent was unable to exercise any disposition to take unfair advantage even if he were so disposed. This statement puts the emphasis in reverse. It is not a question of whether a beneficiary was unable

to exercise disposition. The appellant directs our attention to testimony which would support a finding that the respondent was disposed to influence the testatrix. We have reviewed and considered this testimony. We conclude it is difficult to sustain the finding of the trial court on the element of disposition.

The trial court's findings on confidential relationship, coveted result and susceptibility are sustained. The conclusion that the will was not procured through undue influence is not contrary to the great weight and clear preponderance of the evidence.

### ADMISSIBILITY OF THE LAWYER'S LOGBOOK.

A question of fact arose at trial as to when the will was signed. This was particularly important to the issue of susceptibility since Mrs. Glass' physical and mental condition changed during her hospitalization, particularly after her surgery on November 10, 1975.

The will was dated November 4, 1975, in two places, above Mrs. Glass' signature and above the witnesses' signatures. The date above Mrs. Glass' signature was in the same ink and appeared to be written in by her when she signed the will. The date above the witnesses' signatures appeared to be written by the lawyer.

At his deposition on February 11, 1976, Konnor, first testifying from memory, stated that Mrs. Glass had called him around November 17th and he had arranged to visit her home. He said the respondent had then called him to tell him she was in the hospital. When asked if he meant October, he repeated that it was in November. He said he first met Mrs. Glass within two weeks of her death. He said he saw her the first time several days before the will was executed. He also said he thought the respondent was the first to contact him about the will.

After he was shown the will at the deposition, Konnor said respondent called him the week of October 20th. He then said the will was prepared on November 3rd or 4th.

At the trial, on March 1st, on cross-examination Konnor stated that he was first contacted about the will the week before November 3rd and 4th, and that he first met Mrs. Glass on November 3rd. Konnor explained the discrepancies between his deposition and trial testimony as due to the fact that he did not have his logbook at the time of the deposition because it had been misplaced when he moved to a new office. Konnor admitted that the logbook was subpoenaed for the deposition and said he turned it over to his lawyer as soon as he found it. The logbook admitted into evidence is similar to a lawyer's record-keeping book sometimes referred to as an appointment or day book.

The logbook was admitted into evidence over appellant's lawyer's objections. The trial court said that the explanation that the book was misplaced in moving was adequate to explain his failure to produce it. The court also said the appellant waived a right to object by asking questions about the logbook.

The logbook confirmed that Konnor met with Mrs. Glass on November 3rd and 4th. This was important since the other witness to the will testified that it was signed in late November after Mrs. Glass underwent surgery. After having the date on the will pointed out to her the witness said that she couldn't be sure but she thought it had been signed in late November, although she could not recollect seeing any surgical bandages on Mrs. Glass.

The appellant's lawyer made an offer of proof of the testimony of Catherine Tuchowski, Mrs. Glass' niece-by-marriage, who was declared incompetent to testify because she thought she had been named in a previous will. Mrs. Tuchowski would have testified that when she visited Mrs. Glass on November 9th she said she had not

signed any papers since she had been in the hospital and begged for help to keep her from signing any papers for respondent.

Konnor's associate testified from office records that the will was prepared on the 4th and the bill was sent out on November 12th. She also testified that a bill would not be sent out until after the will had been executed.

The appellant contends that it was prejudicial error for the trial court to admit the logbook into evidence. The appellant cites sec. 804.12, Stats., and Fed. R. Civ. P. 37(b) as authority for refusing the introduction to evidence of documents that have not been produced in response to pretrial discovery requests. Appellant also cites sec. 804.01(5) (b), requiring supplementation of answers made during a deposition. It is argued that the trial court abused its discretion in failing to impose sanctions for this discovery violation. Respondent argues that the alleged error was not prejudicial because the judge did not rely on it in making his findings.

Sec. 804.01(5), Stats., reads:

"(5) SUPPLEMENTATION OF RESPONSES. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows:

". . . .

"(b) A party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which 1. the party knows that the response was incorrect when made, or 2. the party knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment."

Sec. 804.12(4) reads:

"(4) FAILURE OF PARTY TO ATTEND AT OWN DEPOSITION OR SERVE ANSWERS TO INTERROGATORIES OR RESPOND TO REQUEST FOR INSPECTION OR SUPPLEMENT RESPONSES. If a party or an officer, director, or managing agent of a par-

ty or a person designated under s. 804.05 (2) (e) or 804.-06 (1) to testify on behalf of a party fails . . . (d) seasonably to supplement or amend a response when obligated to do so under s. 804.01 (5), the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others, it may take any action authorized under sub. (2) (a) 1, 2 and 3. . . ."

Prohibiting the introduction of certain evidence is one of the sanctions in sec. 804.12 (2) (a) 2, Stats.

Appellant admits that Konnor is not a party and as such had no duty to supplement his testimony with the logbook. However, Konnor did turn over the logbook to respondent's lawyer. Good reasons clearly exist for not penalizing a party for the failure of a witness to supplement deposition answers. In many cases the party will have very little control over the actions of its witnesses. Here however the party's lawyer had the logbook in his possession. There appears to be little excuse for not producing it as soon as it was available.

Fed. R. Civ. P. 37 (b) (2) permits the court to impose a variety of sanctions upon a party who fails to comply with a discovery order. Under the federal rule a party who has not sought an order compelling discovery cannot later complain when the evidence is produced. *Britt v. Corporacion Peruana De Vapores,* 506 Fed.2d 927, 932 (5th Cir. 1975); *GFI Computer Industries, Inc. v. Fry,* 476 Fed.2d 1, 4 (5th Cir. 1973); 4A Moore, Federal Practice, sec. 37.03 [2.–4.] (2d ed. 1978). The cited federal rule lends little support to the argument of the appellant.

Sec. 804.12 (4), Stats., does not require a violation of a discovery order to justify sanctions. Failure to comply with the statutory directive is sufficient. However, the statute does not apply to a response made by a witness who is not a party. Further, the imposition of sanctions

is discretionary with the court. Excusing Konnor for not producing his misplaced logbook at the time of the deposition is not an abuse of discretion. However, holding that the appellant's lawyer had waived the right to object by asking Konner about the logbook was inappropriate. A privilege may be waived by a voluntary disclosure of privileged matter. Sec. 905.11. Where a portion of a writing or recorded statement is introduced the adverse party may have another portion introduced. Sec. 901.07. Here, the appellant's lawyer did not ask about the logbook's contents. He merely asked whether it had been subpoenaed and whether it had been produced in response to that subpoena.

Regardless of the trial court's ruling on appellant's right to object, the result was correct. Fairness and fairness alone would dictate that the logbook be made available to appellant's lawyer as soon as it came into the possession of respondent's lawyer. No statute compels such production. Further, appellant's lawyer did not follow up the failure to produce the logbook at the deposition with a motion to compel discovery under sec. 804.-12(1), Stats. Without a violation of an order to compel discovery appellant had no legal grounds on which to object to the logbook's introduction.

Moreover, even if we were to hold the admission of the logbook was error, it was not prejudicial error. Sufficient credible evidence other than the logbook was introduced for the trial court to find the will was executed on November 4, 1975. Such a finding would reasonably have been made without the corrobration of the logbook.

The order of the trial court is affirmed.

*By the Court.*—Order affirmed.