IN the MATTER OF the ESTATE OF Aurelia
FRIEDLI, deceased: Marcella HOEFT, Objector-
Appellant,

v.

Robert FRIEDLI, Respondent,

NORWEST TRUST & INVESTMENT COMPANY,
Defendant.

Court of Appeals

*No. 91-0209. Submitted on briefs June 21, 1991.—Decided July
31, 1991.*

(Also reported in 473 N.W.2d 604.)

179

180

On behalf of the objector-appellant, the cause was submitted on the briefs of *Carl K. Buesing* of *Halvorsen & Buesing* of Sheboygan.

On behalf of the respondent, the cause was submitted on the brief of *John E. Raftery* of *Hopp, Hodson, Powell & Raftery* of Sheboygan.

Before Nettesheim, P.J., Brown and Scott, JJ.

BROWN, J. This is a will contest case in which Marcella Hoeft, a sister of the deceased, claimed that a brother, Robert Friedli, unduly influenced the deceased into changing a will. Wisconsin recognizes two alternative means for proving undue influence—a two-element test and a four-element test. Marcella advanced both tests, but the trial court found against her.

Because Marcella proved that a fiduciary relationship existed between Robert and the deceased, we reverse the trial court's finding that the first part of the two-prong test was not proven and we remand with directions that the trial court decide whether Marcella has proven the second part of that test. Similarly, because the trial court incorrectly took judicial notice of a fact not in evidence while deciding the four-element test, we reverse and remand on that test.

The deceased is Aurelia Friedli who died on December 24, 1989, at the age of eighty-six. Marcella and Aurelia lived across the hall from each other in the same apartment building since 1975. Robert lived in Florida since 1966.

181

Aurelia suffered a severe stroke in June of 1989. Following her stroke, Robert came to Wisconsin on June 18. Robert claimed that during a visit to the hospital Aurelia requested he obtain a lawyer because she wanted to rewrite her will. Robert testified that, pursuant to Aurelia's request, he contacted Attorney James Dillman, Robert's good friend and former law school roommate. Robert said that he contacted Attorney Dillman even though Attorney Douglas Van de Water had drafted Aurelia's original will; Robert claimed that he did not know Van de Water was the original draftsman.

Robert testified that before drafting the new will, Dillman requested to see Aurelia's original will which was kept in a safety deposit box at Norwest Trust & Investment Company. Dillman drafted a power of attorney which gave Robert the power to do and perform every act that Aurelia legally could do through an attorney. Aurelia signed this power of attorney, thereby enabling Robert to retrieve the original will from her safety deposit box. Robert claimed that he did not review the rest of the contents in the box but merely retrieved the will from the top of the rest of the papers.

On June 22, Aurelia signed the will that Dillman prepared. This new will was similar to Aurelia's original will signed in 1985, except that the new will provided for some specific bequests of collectibles and gave all the remaining personal property to Robert rather than to Marcella. The residual estate, however, was still split evenly between Marcella and Robert. After the will was executed, Robert returned to Florida.

Dillman mailed Robert a copy of the new will. During a customary weekly phone call between Robert and Dillman, Robert told Dillman that he was concerned about a couple of the provisions in the will. In particular, Robert wanted Dillman to casually suggest to Aurelia

that she change a provision in the will which read that if Robert predeceased Aurelia, his share of the estate would pass to his issue. Robert wanted this changed to provide that if he predeceased Aurelia, his share would be divided equally among his wife and four children.

Robert visited Aurelia again from September 7 to September 11. His wife, Peggy, accompanied him on this trip. During this time, Robert and Peggy paid a social visit to the Dillman home. While talking with Dillman, Robert reminded him about the predecease clause in the will.

After returning to Florida, Robert received a letter from Dillman. A copy of the redraft of the will that Dillman and Aurelia agreed upon was enclosed. The significant feature of the redraft was a change in paragraph five, providing that the residual estate was to be awarded eighty percent to Robert and twenty percent to Marcella, rather than equally split as stated in previous versions of the will. The letter from Dillman to Robert stated in part, "Paragraph fifth is drawn along the lines we discussed when you and Peggy were here." The letter ended by stating, "I hope this draft meets with your approval."

Robert claimed that he never discussed the eighty/twenty split with Aurelia or with Dillman and that the additional benefit was a complete surprise to him. Robert testified that after receiving the letter and draft, he never called Dillman to discuss them.

On September 29, while recovering from her stroke at a nursing facility in Sheboygan, Aurelia signed this new version of her will. On November 3, Aurelia suffered an attack of pneumonia and was again hospitalized. Robert flew up and stayed from November 14 through November 28. Robert stated that, during a visit with Aurelia, she suddenly told him that she wanted to see an attorney because she was unhappy with the church.

183

Because Dillman had passed away in the first week of November, Robert called Attorney Michael Roth of the Dillman firm. Robert told Roth that Aurelia wished to eliminate from her will a bequest of $1,000 to another brother, Calvin, who had recently died. Robert also told Roth that Aurelia wished to reduce the specific bequest to her church from $10,000 to $5,000.

Roth testified that he and a secretary from his office went to the hospital with a prepared codicil to witness the signing by Aurelia.

Aurelia passed away on December 24. Marcella challenged the admission to probate of Aurelia's last will with the codicil claiming that they were the result of undue influence by Robert.

At the probate proceeding, several friends and acquaintances testified on behalf of Marcella that the effects of the stroke changed Aurelia from a confident, independent, incisive person to a listless, despondent, dependent person. The witnesses to the execution of the September 29 will and subsequent codicil testified, however, that Aurelia appeared lucid and competent when she signed the two documents. The probate court found that they were executed properly and that Aurelia was competent when she signed them.

 There are two avenues by which an objector to a will may challenge its admission on the theory of undue influence. *In re Estate of Kamesar,* 81 Wis. 2d 151, 158, 259 N.W.2d 733, 737 (1977). One is called the two-element test. Under this test, the objector must prove the existence of: (1) a confidential or a fiduciary relationship between the testator and the favored beneficiary, and (2) suspicious circumstances surrounding the making of the will. *In re Estate of Malnar,* 73 Wis. 2d 192, 202, 243 N.W.2d 435, 440–41 (1976).

The other is known as the four-element test. These elements are: (1) susceptibility to undue influence, (2) opportunity to influence, (3) disposition to influence, and (4) coveted result. *Kamesar,* 81 Wis. 2d at 158, 259 N.W.2d at 737. When the objector has established three of the four elements by clear and convincing evidence, only slight evidence of the fourth is required. *Id.* at 158, 259 N.W.2d at 737–38.

Only one test need be met for the objector to prevail. *In re Estate of Vorel,* 105 Wis. 2d 112, 117, 312 N.W.2d 850, 853 (Ct. App. 1981). Marcella offered both theories.

The trial court held that the two-element test was not satisfied because Marcella produced insufficient evidence relating to the first prong of the test, which the court identified as that establishing a "confidential relationship."

The trial court held that the four-element test was not satisfied either. It found that Marcella had proven two of the elements—a coveted result for Robert, and an opportunity, on Robert's part, to influence. It also determined, however, that Marcella failed to prove Robert's "disposition to influence" and Aurelia's "susceptibility" to be influenced. A central focus of the trial court's decision regarding Robert's lack of "disposition to influence" was its conviction that Dillman's letter was not proof of Robert's disposition to influence as much as it was an example of Dillman's "droll sense of humor." The trial court arrived at this conclusion based upon its personal acquaintance with Dillman.

We will discuss the trial court's disposition regarding the two-element test first. The law relating to that test is set forth in *Malnar* as follows:

> Where the relationship between the testatrix and the principal beneficiary is "confidential or *fiduciary*" in nature, that fact, "coupled with the existence of 'suspicious circumstances,' " is enough to create the presumption or inference of undue influence.

*Malnar,* 73 Wis. 2d at 202, 243 N.W.2d at 440–41 (emphasis added) (citation and footnote omitted). As the above passage clearly states, the objector establishes the first element by proving the existence of *either* a confidential relationship *or* a fiduciary relationship between the testator and the favored beneficiary.

The trial court focused upon the confidential aspect of the first prong to the exclusion of the fiduciary aspect. It held that Marcella failed to establish Aurelia's reliance upon Robert for advice in personal financial affairs or in other matters touching her daily needs. Because the trial court held that the first prong of the two-part test was not satisfied, it did not address the second part of the test.

By failing to address whether a fiduciary relationship had been created, the trial court misapplied *Malnar.* The question remaining is whether there is evidence that a fiduciary relationship existed.

Marcella claims that this question was answered in *Malnar,* where the supreme court wrote that the granting of the power of attorney creates the existence of a fiduciary relationship. *Malnar,* 73 Wis. 2d at 203, 243 N.W.2d at 441. However, Robert reads *Malnar* to say that the granting of a power of attorney, by itself, does not create a fiduciary relationship. He notes that the decision speaks to the existence of reliance by the testator upon the beneficiary. Robert asserts that whether it is a confidential relationship or a fiduciary relationship, evidence of reliance, such as for financial advice, is necessary.

We disagree with Robert's reading of *Malnar*. As we read the case, the discussion of reliance by the testator was used to support the existence of a confidential relationship in that case; it was not used in the context of discussing a fiduciary relationship. As to that kind of relationship, the court stated that a fiduciary relationship need only be shown to *exist* and that a power of attorney creates the fiduciary relationship. Nothing more is needed.

Robert also fails to cite *Vorel*. There, the execution of a power of attorney the day before the execution of a will, without more, was held to be enough to create a fiduciary relationship.

We hold that the first prong of the two element test was satisfied as a matter of law with uncontradicted proof that Aurelia executed a power of attorney to Robert. This does not end the matter regarding the two-element test, however, since the existence of a fiduciary relationship alone is not undue influence. *Vorel,* 105 Wis. 2d at 117, 312 N.W.2d at 853. Marcella still must prove "suspicious circumstances," the second prong. *See id.* Because the trial court did not reach the second prong, due to its erroneous determination that Marcella had failed with respect to the first prong, we remand for consideration of the second prong.

We now reach the four-element test. To show Robert's disposition to influence, Marcella produced a letter from Dillman to Robert which we reproduce in a footnote.[1] As we have before indicated, paragraph five shows

---

[1]The letter from Attorney Dillman to Robert reads in relevant part:

Dear Bob:

Enclosed is a photocopy of the redraft of Aurelia's will.

the change from a fifty/fifty disposition between sister and brother, evident in Aurelia's previous will, to an eighty/twenty allocation in the new will—in Robert's favor. A reasonable mind, reading Dillman's letter, could infer that paragraph five was changed consonant with a discussion Robert had with Dillman prior to the letter. A reasonable mind could also infer that the words "I hope this draft meets with your approval" evidences Robert's disposition to influence the will.

In response to the letter, Robert denied that he gave any directions to Dillman and stated that the eighty/twenty division came as a complete surprise to him. A reasonable mind could believe Robert and discount the letter. The trier of fact can choose either of the alternate competing inferences.

The trial court, sitting as fact-finder, did neither. The trial court stated:

> From my acquaintance with Attorney Dillman I am aware of his "droll sense of humor" so that the con-

---

I saw her Friday afternoon and after some discussion, this is what we came up with.

First, she didn't feel comfortable omitting Calvin completely, so we settled on the $1,000.00 bequest.

Paragraph fifth is drawn along the lines we discussed when you and Peggy were here. The thought occurred to me that if Peggy and you were killed in a plane accident flying to or from Sheboygan, we would have a gaping hole in the will. The same would be true in Marcella's will.

I know that you don't like the word issue, so I have substituted heirs. The result would be the same.

It's nice hearing from Peggy and you after your return. Thanks for your note, Peggy.

I hope this draft meets with your approval.

188

tents of the letter do not rise to the level of clear, satisfactory and convincing evidence.

The trial judge thereby established as an adjudicative fact that which was known to him as an individual; it was not an inference derived from the testimony—documentary or otherwise. The usual method of establishing adjudicative facts is through the introduction of evidence, ordinarily consisting of the testimony of witnesses. Wis. R. Evid. 902.01 federal advisory committee's note [59 Wis. 2d R26, R27]. If particular facts are outside the area of reasonable controversy, this procedure is dispensed with as unnecessary. *Id.* A high degree of indisputability is the essential prerequisite of judicial notice. *Id.* Although the trial court did not state that it was taking judicial notice of Dillman's sense of humor, we conclude that this is exactly what the trial court did.

Section 902.01(2), Stats., teaches that:

A judicially noticed fact must be one not subject to reasonable dispute in that it is either (a) generally known within the territorial jurisdiction of the trial court or (b) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Our supreme court stated long ago that matters of which the trial court has knowledge as an individual are not the kind of matters of which it may take judicial notice. *Kuder v. State,* 172 Wis. 141, 144-45, 178 N.W. 249, 250 (1920). We recognize that the trial judge's opinion was guided by good faith reliance upon his past experience and personal knowledge. However, the court's duty was to find all facts adjudicative of the dispute between the immediate parties—who did what, where, when, how and with what motive or intent. Dillman's sense of

189

humor was neither part of the evidence nor a fact generally known within the "territorial jurisdiction of the trial court"; and it was not capable of ready determination by resort to sources whose accuracy cannot be reasonably questioned. *See* sec. 902.01(2). Rather, the trial court's statement was more a rumination based upon individual experience than an observation about which the general truth is well-known. Yet, the rumination became not only a fact, but a decisive one. A fact must be fairly well known and obvious before judicial notice of it can be taken. *International Harvester Co. v. Industrial Comm'n,* 157 Wis. 167, 179, 147 N.W. 53, 58 (1914).

Although no published Wisconsin cases directly address judicial notice of an individual's sense of humor, there is authority from other jurisdictions. The Kansas Supreme Court has stated:

> It is improper for a trial court to take judicial notice of the reputation of a particular individual. Personal reputation is not a matter of such "generalized knowledge" that it cannot reasonably be the subject of dispute.

*Weigand v. Union Nat'l Bank,* 610 P.2d 572, 579 (Kan. 1980) (citations omitted). The Missouri Supreme Court addressed the same issue and decided likewise using similar language. *Lorenz v. Towntalk Pub. Co.,* 261 S.W.2d 952, 954 (Mo. 1953).

We hold that taking judicial notice of an individual's sense of humor is the same as taking judicial notice of a person's reputation. It is improper to take judicial notice of these kinds of matters because they might be subject to a difference of opinion. We decide that the trial court abused its discretion when it took what amounted to judicial notice of Dillman's "sense of

humor" in deciding the intent of one of the parties to this case.

We remand to the trial court to review the evidence concerning the four-part test. The trial court is directed to redetermine whether the "disposition to influence" prong has been met. If the trial court determines on review that this element has been proven to the requisite level of proof, then Marcella will have proven three of the four elements needed. Should this occur, the court will then have to re-evaluate the "susceptibility" prong to determine if that element has been proven by "slight evidence."

*By the Court.*—Order reversed and cause remanded with directions.