COURT OF APPEALS
DECISION
DATED AND FILED

April 16, 2020

Sheila T. Reiff
Clerk of Court of Appeals

NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1065**

Cir. Ct. No. 2017PR34

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

IN RE THE ESTATE OF CLARENCE J. TEYNOR:

GERTRUDE L. ADAMS,

  PETITIONER-RESPONDENT,

 V.

TRUDIE TEYNOR,

  RESPONDENT-APPELLANT,

MELISSA TEYNOR AND JENNIFER SIVERIO,

  RESPONDENTS.

APPEAL from an order of the circuit court for Crawford County: LYNN M. RIDER, Judge. *Affirmed*.

Before Fitzpatrick, P.J., Kloppenburg and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in Wis. Stat. Rule 809.23(3).**

¶1 PER CURIAM. In June 2017, Clarence J. Teynor executed a will directing that his property be sold and the net proceeds from the sale be distributed to his siblings and one nephew. The will directed that no provision be made for Clarence's children.[1] After Clarence died in November 2017, his three living children, Trudie Teynor, Melissa Teynor, and Jennifer Siverio, challenged the will on the ground that Clarence was "medically, physically, and mentally incapacitated and disabled" and that Clarence's sister, Gertrude Adams, and Gertrude's husband, Gary Adams, exercised undue influence over Clarence when he executed the will. Following a court trial in May 2019, the circuit court concluded that Clarence had testamentary capacity when executing the will and that the will was not a product of undue influence. Clarence's daughter Trudie appeals, arguing that the court's findings regarding undue influence are clearly erroneous.[2] We conclude that Trudie fails to show that the court's findings as to the undue influence elements are clearly erroneous. Accordingly, we affirm.

---

[1] Because multiple parties in the case share last names, after initial introduction we will generally refer to the parties and their family members by their first names. While Clarence's sister, Gertrude Adams, is sometimes referred to as "Trudie" in the record, we will refer to her only as "Gertrude" in this opinion to differentiate her from Trudie Teynor, who is Clarence's daughter and the appellant in this case.

[2] Both parties also refer to the "contrary to the great weight and clear preponderance of the evidence" test. We have explained that the "clearly erroneous" standard is substantively the same as the "great weight and clear preponderance of the evidence" test stated in older cases. *Noll v. Dimiceli's, Inc.*, 115 Wis. 2d 641, 643, 340 N.W.2d 575 (Ct. App. 1983).

Trudie does not contest on appeal the circuit court's findings as to Clarence's testamentary capacity, and, therefore, we deem any arguments as to those findings abandoned. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) (An issue raised in the circuit court but not raised on appeal is deemed abandoned.).

**BACKGROUND**

¶2    The following facts are not in dispute.  With the assistance of Attorney Mark Gillitzer, Clarence executed a will on May 24, 2017.  With the assistance of Attorney Tom Peterson, Clarence executed another will on June 16, 2017.  Clarence died on November 21, 2017.

¶3    On November 30, 2017, Gertrude filed the June 16 will for informal probate administration.  The will provides for the following distribution of Clarence's estate:  35% to Gertrude, 12% each to five other of Clarence's siblings, and 5% to Clarence's nephew, Seth Adams.  The will expressly notes that Clarence was "mindful" of his three living children, Melissa, Trudie, and Jennifer, but states, "I make, however, no provision for [them]."  On December 18, 2017, Melissa, Trudie, and Jennifer filed an objection to the admission of the will to probate.  Following a court trial in May 2019, the circuit court admitted the June 16 will to probate.  Trudie appeals.

¶4    We will mention other material facts in the following discussion.

**DISCUSSION**

¶5    As stated, Trudie contends that the circuit court erred in concluding that the will was not a product of undue influence.  We first state the standard of review.  We next state the applicable legal principles as to undue influence and identify the undue influence elements that Trudie contends were affected by the court's erroneous fact-finding.  Finally, we summarize the court's findings for each element in turn and explain why we reject Trudie's challenges to those findings.

3

*A.  Standard of Review*

¶6     We accept the circuit court's findings of fact regarding undue influence unless they are clearly erroneous.  *See* WIS. STAT. § 805.17(2) (2017-18) (addressing fact-finding in a trial to the court); ***Odegard v. Birkeland***, 85 Wis. 2d 126, 134, 270 N.W.2d 386 (1978) (addressing fact-finding regarding undue influence); ***Miller v. Vorel***, 105 Wis. 2d 112, 116, 312 N.W.2d 850 (Ct. App. 1981) (same). [3]  When the circuit court "acts as the finder of fact, and where there is conflicting testimony, the [circuit court] is the ultimate arbiter of the credibility of the witnesses.  When more than one reasonable inference can be drawn from the credible evidence, the reviewing court must accept the inference drawn by the trier of fact." ***Noll v. Dimiceli's, Inc.***, 115 Wis. 2d 641, 644, 340 N.W.2d 575 (Ct. App. 1983) (quoted source omitted); *see also* ***Miller***, 105 Wis. 2d at 116.

¶7     We search the record for facts to support the findings the circuit court did make, not for evidence to support the findings the court did not make. ***Odegard***, 85 Wis. 2d at 134.  It is for the circuit court, not this court, to resolve conflicts in the testimony.  *See* ***Fuller v. Riedel***, 159 Wis. 2d 323, 332, 464 N.W.2d 97 (Ct. App. 1990).[4]

---

[3] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[4] Trudie asserts that, because the circuit court relied on "documentary evidence" in making factual findings, this court need not accord the circuit court's findings any special deference, citing ***Sieloff v. Golz***, 80 Wis. 2d 225, 258 N.W.2d 700 (1977).  ***Sieloff*** broadly notes that "when the evidence to be considered is documentary, a reviewing court is not bound by any inferences that may have been drawn by the factfinder and, therefore, need not afford a [circuit] court's findings any special deference." ***Id.*** at 241.  However, Trudie fails to explain, with supporting legal authority, how ***Sieloff***, a criminal case regarding an appellate court's review of a circuit court's probable cause determination, applies in undue influence cases.  Moreover, in this case both parties introduced numerous documents into evidence and heavily relied on those documents in their arguments to the court.  In such a case, while we acknowledge that "there are

(continued)

## B. Applicable Legal Principles

¶8    Undue influence must be proved by clear, satisfactory and convincing evidence.  *Hamm v. Jenkins*, 67 Wis. 2d 279, 282, 227 N.W.2d 34 (1975).  "There are two avenues by which an objector to a will may challenge its admission on the theory of undue influence."  *Hoeft v. Friedli*, 164 Wis. 2d 178, 184, 473 N.W.2d 604 (Ct. App. 1991).  One avenue is known as the "four-element test" and requires proof of susceptibility to undue influence, opportunity to unduly influence, disposition to unduly influence, and a coveted result.  *Id.* at 185; *Miller*, 105 Wis. 2d at 116.  The other avenue is known as the "two-element test" and requires proof of "a confidential or a fiduciary relationship between the testator and the favored beneficiary," and the existence of "suspicious circumstances surrounding the making of the will."  *Hoeft* at 184.

¶9    "Only one test need be met for the objector [to the will] to prevail."  *Id.* at 185.  The circuit court in this case determined that Melissa, Trudie, and Jennifer did not meet their burden to prove either of the undue influence tests.

---

broad pronouncements in prior cases indicating that fact finding based on documentary evidence is not accorded deference, it is clear that when parties effectively invite fact finding based on [documentary evidence] … the resulting factual findings are accorded deference on appeal."  *State v. Leitner*, 2001 WI App 172, ¶36, 247 Wis. 2d 195, 633 N.W.2d 207 (internal citations omitted).  In addition, as we explain below, the circuit court's findings here were also based on its weighing and crediting of the testimony at trial, which sufficed to support those findings.

## C. Analysis

### 1. Four-element Test

¶10    As to the four-element test, Trudie challenges only the circuit court's findings regarding the elements of susceptibility to undue influence and disposition to unduly influence.  We address each element in turn.

#### a. Susceptibility to Undue Influence

¶11    In finding whether susceptibility to undue influence exists, the circuit court examines such factors as the testator's "age, personality, physical and mental health and ability to handle business affairs."  *Lee v. Kamesar*, 81 Wis. 2d 151, 159, 259 N.W.2d 733 (1977).  Susceptibility to undue influence is established "[i]f consideration of these factors demonstrates that the testator was unusually receptive to the suggestions of others and consistently deferred to them on matters of utmost personal importance."  *Johnson v. Merta*, 95 Wis. 2d 141, 156-57, 289 N.W.2d 813 (1980).

¶12    The circuit court found that Clarence was not susceptible to undue influence in the drafting and execution of his will.  The court found that, although Clarence had his whole life been "a person that was looking for a get-rich-quick scheme," that did not mean he was vulnerable to influence in the drafting and execution of his will.  In particular, the court referenced Clarence's doctor's testimony describing the doctor's efforts "to influence [Clarence] in a positive way to take steps to address" his health, but that Clarence would not take those steps "because he was too stubborn."  The court also credited testimony indicating that Clarence's negativity about his daughters "was not something that came about in the year prior to his death.  I know his physical health deteriorated substantially in

the few years prior to his death, but he treated his daughters with such disrespect that more than one witness testified [about how they had to redirect Clarence so the conversation would not] turn negative."

¶13     As we explain, we conclude that the trial record supports the circuit court's finding that Clarence was not susceptible to undue influence in the drafting and execution of his will.

¶14     The trial record is replete with evidence of Clarence's long-standing cantankerous, obstinate, and strong-willed personality, which he directed towards his children and others alike.  Clarence's grandson and Trudie's son, Isaiah Teynor, testified that Clarence "was always angry with my family … [h]e would just talk to me about how my family was so evil"; that Clarence would call Isaiah's mother, Trudie, "[n]ot good [names]"; and that Clarence often accused Isaiah's family of stealing from Clarence.  Attorney Peterson testified that he had known Clarence at least since high school, that Clarence "was gruff and he was cantankerous," and that "I don't know that [Clarence] treated anyone with respect."  Clarence's doctor testified that Clarence's May 2017 hospital records referred to Clarence as "cantankerous and verbally abusive to staff."

¶15     Clarence's doctor testified that Clarence understood his medical treatment, but that Clarence picked and chose what medical advice he wanted to follow and ultimately chose to die rather than have his foot amputated.  The doctor testified that she did not invoke a health care power of attorney to make decisions for Clarence, because she found Clarence competent to make medical decisions on his own.  She testified that she "could not easily influence him."

¶16     Attorney Peterson testified as follows.  When Peterson visited Clarence in the nursing home on June 9, 2017, Clarence expressed his desire that

his daughters get nothing in the will. Peterson returned about a week later on June 16, 2017, with the will. On that day, Peterson went through the will with Clarence, and Clarence provided the percentages of his estate he wanted to distribute to each beneficiary. Clarence told Peterson about "the confidence that he had in his sister [Gertrude], and that she would do the right thing of selling the farm, if it had to be sold." No one else was in the room during this conversation with Clarence. Peterson sat and spoke to Clarence twice in making the will, and Clarence "seemed fine" to him; it never entered Peterson's mind to contact a medical doctor to assess Clarence's competency.

¶17 Gertrude testified that Clarence "liked to make his own decisions. Whether they were right or wrong, he still wanted to be the one to make them." Gary testified that Clarence's "mental process … was the same for the last 45 years that I've known him in the Teynor family, until late September and October of '17 … when he was on morphine."

¶18 As to Clarence's ideas about what he wanted in his will, Attorney Gillitzer, who had known Clarence for forty-five years, testified that when he met with Clarence to prepare a will in May 2017, Clarence told Gillitzer that Clarence wished to leave the farm to his siblings and that Clarence "was very adamant … [that] he didn't want anything going to his daughters." Attorney Peterson, who had known Clarence since high school, testified that when he met with Clarence to prepare a will in June 2017, Clarence told Peterson that he did not want to leave anything to his daughters.

¶19 In her appeal challenging the circuit court's susceptibility finding, Trudie points to the following evidence that: Clarence had dementia with waxing and waning bouts of confusion; in the weeks before he died, Clarence wished his

daughters were with him and, during a visit with Melissa, Clarence signed a note indicating his desire to add Melissa to the will; and there were circumstances supporting "an inference" that Gary and Gertrude "planted" a belief in Clarence's mind that Trudie stole from Clarence. While this evidence might have supported a finding of susceptibility to undue influence, the court's finding that Clarence was not susceptible to undue influence in the drafting and execution of his will is not clearly erroneous given the evidence cited above and the court's weighing and crediting of that evidence.

### b. Disposition to Unduly Influence

¶20    Disposition to unduly influence means something more than a mere desire to obtain a share of an estate; it implies a willingness to do something wrong or unfair, with grasping or overreaching characteristics. *Kehrberg v. Pribnow*, 46 Wis. 2d 205, 214, 174 N.W.2d 256 (1970). Disposition to unduly influence has also been described as a willingness to bring about a "result favorable to [oneself] and unjust to another." *Schaefer v. Ziebell*, 207 Wis. 404, 415, 241 N.W. 382 (1932).

¶21    The circuit court found that there had not "been any evidence, other than speculation or suspicion, that anybody did exert undue influence." Implicit in this finding is the finding that Gertrude and Gary did not have the disposition to do so.[5] As we explain, we conclude that the record sufficiently supports such a finding.

---

[5] This finding defeats Trudie's assertion that the circuit court "made no specific finding" as to whether Gary and Gertrude had the disposition to influence.

¶22 Gertrude testified as follows. Before Clarence moved into a nursing home, Clarence visited Gertrude's home for dinner three to five times a week. The condition of Clarence's house "was terrible. It was a bachelor's house that he never took care of." Gertrude considered Clarence a "pack rat" and would implore Clarence to sell his house and farm so that he could build a new house and live properly, but Clarence would not listen to her. After Clarence moved into the nursing home, Gertrude visited Clarence "probably two or three times a week." During one such visit, Clarence asked Gertrude to find him a lawyer so that he could write a will and have Gertrude designated as Clarence's power of attorney. Gertrude told Clarence she could do it if her husband Gary could help her, and Clarence said he had no problem with that. Gertrude and Gary worked to find a lawyer. Attorney Gillitzer prepared a will for Clarence, but did not draft the power of attorney. Gertrude was not present at any of the meetings that Clarence had with Gillitzer, because "[w]hen [Clarence] asked for somebody to do his Will, he said he wanted it private. He did not want anybody there besides the lawyer or witnesses that had to be there." Clarence directed Gertrude to "get rid" of Gillitzer and to get him a new lawyer, and Clarence agreed for Gertrude to hire Attorney Peterson. Gertrude did not participate in the drafting of either will, and did not know the contents of the will until after Clarence died.

¶23 Gary testified as follows. Clarence told Gertrude that he wanted a will and a power of attorney. At Gertrude's request, Gary helped locate and employ attorneys to visit Clarence in order to prepare a will and a power of attorney. "Social services" demanded Clarence get a power of attorney or they would "throw him out of the nursing home." After Attorney Gillitzer visited Clarence, Clarence told Gertrude to fire Gillitzer because, according to Clarence, Gillitzer did not help him designate a power of attorney as Clarence had requested.

Gary did not know that Clarence had signed a will prepared by Gillitzer until after Clarence's death. Gertrude visited Clarence more frequently than Clarence's children visited Clarence. Gary never told Clarence that his daughters stole from him, and did not suggest that Clarence disinherit his three daughters in his will.

¶24 Attorney Peterson, who assisted Clarence in the preparation of the June 2017 will, testified as follows pertinent to this element. Peterson received a call from Gary asking him to visit Clarence because Clarence wanted a will and a power of attorney. Gary did not give Peterson any direction about what Clarence wanted in his will, "[n]or would [Peterson] listen to … somebody [other than his client] directing [him] what to put in a will." When Peterson visited Clarence in the nursing home on June 9, 2017, Clarence expressed his desire that his daughters get nothing in the will and expressed his confidence in his sister Gertrude. Clarence said that Gertrude would get more of the estate than anyone else because Gertrude "had been especially good to him." Peterson sent the bill for his will services to Gary, because Gertrude was Clarence's power of attorney. Neither Gary nor Gertrude provided any direction about what went into the will, nor were they present in the room when the will was drafted.

¶25 The circuit court found Attorney Peterson's testimony "very credible." The court also found that "as painful" as it was to hear testimony about how little regard Clarence had for his children, it was "clearly the way that [Clarence] felt, not at just one little isolated period of time but over a period of time." Thus, as stated, the court found no evidence that "anybody did exert undue influence."

¶26 Trudie's entire argument on appeal regarding this element is that this court should find that Gertrude and Gary had a disposition to unduly influence

because they "kept their activities managing [Clarence's] finances secret from [Trudie] and her sisters [and] they knew they were acting unfairly." Trudie directs us to: (1) Gary's testimony that he did not tell Clarence's daughters that the nursing home had contacted Gertrude about Clarence needing a power of attorney; and (2) a part of the record in which Melissa testified that Gary and Gertrude did not usually visit with Clarence long if Melissa was also visiting Clarence. Trudie's argument is unavailing.

¶27     As stated, the standard of review on appeal is whether the circuit court's findings are clearly erroneous. *Hamm*, 67 Wis. 2d at 282; *see also Miller*, 105 Wis. 2d at 116. Trudie does not show that the circuit court erred. Trudie's arguments disregard the circuit court's role as the ultimate arbiter of the weight and credibility of the evidence. Trudie would have this court credit and weigh the evidence differently from the circuit court. But, that is not our role. On appeal we review the record to determine whether a finding is clearly erroneous. We search the record for facts to support the findings the circuit court did make, not for evidence to support the findings the court did not make. *Odegard*, 85 Wis. 2d at 134. The record contains evidence that Clarence was close to Gertrude and trusted her, and that Gertrude was close to Clarence, visited Clarence multiple times a week, and took care of Clarence's finances with the help of her husband. Trudie fails to show that the finding that Gertrude and Gary did not have the disposition to unduly influence Clarence in the drafting and execution of his will is clearly erroneous.

### 2. Two-element Test

¶28     As to the two-element test, Trudie challenges only the circuit court's finding as to the element of the existence of suspicious circumstances.

*Existence of Suspicious Circumstances*

¶29    The existence of suspicious circumstances may be proven through evidence regarding "the activity of the beneficiary in procuring the drafting and execution of the will, or a sudden and unexplained change in the attitude of the testator, or some other persuasive circumstance." *Lee*, 81 Wis. 2d at 166 (quoted source omitted).

¶30    The circuit court found that "[s]imply calling an attorney on behalf of someone to have the attorney go and meet, as long as neither [Gertrude nor Gary] were present during those meetings, that in and of itself is not a suspicious circumstance." The court also credited evidence showing that Clarence had multiple

> opportunities where he met with these lawyers [which] gave him time to think about it.… They had a conference, and the attorneys had time to draft it and go back and see him at a later date. So he had time to contemplate, and both Attorney Gillitzer and Attorney Peterson are experienced attorneys with regard to estate planning and probate matters, which is also what leads me to think that Attorney Gillitzer wouldn't have taken notes to do a Will based on what Mr. Adams told him.… In any event, the Will that was drafted by Attorney Gillitzer is not really what is before us today. The relevance of [the will that Attorney Gillitzer drafted] is that it shows that Clarence Teynor's thought that he didn't want to make a bequest for his children was not a one-time whim. It was something he had contemplated before. He had made a Will in May [with Attorney Gillitzer] that did not provide for his children, and he continued to be of that mind in June when he had Attorney Peterson come up and execute [the June will].

¶31    The evidence credited by the circuit court supports its finding of the absence of suspicious circumstances.

¶32    Attorney Gillitzer, who drafted the May will, testified that he considered Clarence the client, not Gary Adams. Gillitzer testified that Clarence was adamant about his desire to leave nothing to his daughters and that Clarence indicated his daughters "took sides" in a family drama from "a long time ago." Gillitzer testified that, over the course of three meetings with Clarence, Clarence's behavior and demeanor were consistent and Gillitzer had no doubts as to Clarence's competency.

¶33    Attorney Peterson, who drafted the June will at issue in this case, testified that Gertrude and Gary did not tell him what to put in the will, and that Clarence wanted to leave nothing to his daughters.

¶34    There was also evidence in the record suggesting that Clarence harbored ill will against his daughters, as follows.

¶35    Clarence's brother, Will Teynor, testified that Clarence had decided his daughters were greedy.

¶36    Trudie testified that her children reported to her that Clarence had touched them inappropriately, and that she then told Clarence that she would kill him if he ever touched her children like that again. Trudie testified that years later, when Trudie believed that Clarence had behaved inappropriately toward her children again, she told Clarence that Clarence could not live with her anymore, and Clarence returned to living in his own home.

¶37    In challenging the circuit court's finding of the absence of suspicious circumstances, Trudie directs our attention to the following as evidence of "suspicious circumstances": Gary and Gertrude did not usually visit with Clarence long if Melissa was also visiting Clarence, suggesting that Gertrude and

Gary were keeping the wills "secret"; Gary and Gertrude undertook various financial activities in exercising Clarence's power of attorney; Gary and Gertrude took certain actions in support of procuring the will; despite a conflict of interest, Gary listed Clarence's farm for sale at Clarence's request to preserve Clarence's Medicare and Social Security benefits; and Gary told Attorney Gillitzer the proposed beneficiaries and the percentages they were to receive before Gillitzer learned those details from Clarence. However, for the reasons we stated above in rejecting Trudie's challenges to the circuit court's findings as to the elements of susceptibility to undue influence and disposition to unduly influence, that these particular pieces of evidence may tilt in Trudie's favor is not sufficient.

¶38   Trudie asserts, citing ***Vargo v. Beaudry***, 46 Wis. 2d 230, 241, 175 N.W.2d 473 (1970) that "because acts of undue influence are usually done in secret, proof thereof must be based on circumstantial evidence." However, Trudie does not point to circumstantial evidence that would lead us to conclude that the circuit court erred in its findings as to the suspicious circumstances element, but instead renews her argument that the evidence presented at trial balances in her favor.

¶39   Finally, Trudie argues that where a testator disinherits the "natural objects of his bounty," as Clarence disinherited his daughters, this raises a "red flag of warning," citing ***Kamesar***, 81 Wis. 2d at 162. However, the fact of a testator disinheriting such people "alone does not render the disposition unnatural where a record shows reasons as to why a testator would leave out those who may be the natural beneficiaries of his bounty." ***Id.*** at 162-63. As we have explained, the record provides evidence of reasons why Clarence would leave out his daughters from his will, which the circuit court credited.

¶40 In sum, Trudie fails to show that the circuit court's finding of absence of suspicious circumstances is not clearly erroneous.

## CONCLUSION

¶41 For the reasons stated, Trudie fails to show that the circuit court's findings as to the elements concerning undue influence are clearly erroneous. Accordingly, we affirm.

*By the Court*.—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE § 809.23(1)(b)5.