COURT OF APPEALS
DECISION
DATED AND FILED

March 14, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2021AP2180**

Cir. Ct. No. 2019CV97

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

ALICE L. TALMAGE, INDIVIDUALLY AND AS TRUSTEE OF THE
TALMAGE JOINT REVOCABLE TRUST DATED NOVEMBER 29, 2006,

    PLAINTIFF-APPELLANT,

  V.

STEVEN R. TALMAGE AND DIANNE L. TALMAGE,

    DEFENDANTS-RESPONDENTS.


       APPEAL from a judgment and an order of the circuit court for St. Croix County: R. MICHAEL WATERMAN, Judge. *Affirmed*.

       Before Stark, P.J., Hruz and Gill, JJ.

       **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Alice L. Talmage gifted real property she owned in trust to two of her children, Steven R. Talmage and Dianne L. Talmage, via a trustee's deed.[1] Alice later contested this transfer. Following a two-day bench trial, the circuit court concluded that the trustee's deed was valid. It also determined, however, that Steven breached his duty as Alice's attorney-in-fact and that Steven and Dianne converted some of Alice's funds without her permission. The court, therefore, entered a money judgment in Alice's favor against Steven and Dianne. Alice then moved for reconsideration on the basis that the trustee's deed failed to comply with the trust requirements, but the court denied the motion.

¶2 Alice appeals from the circuit court's judgment and from the court's order denying her motion for reconsideration. On appeal, Alice argues that the trustee's deed violated the terms of the trust, that the property transfer was procured as a result of undue influence, that Alice was not competent to execute the trustee's deed, and that the circuit court erred by failing to include additional amounts in the money judgment. For the reasons that follow, we affirm the circuit court's decisions.

## BACKGROUND

¶3 Alice was married to Robert Talmage, and they had three children: Steven, Dianne, and John Talmage. Alice and Robert owned real property in New Richmond, Wisconsin, which consisted of a farmhouse, a log home, and approximately 120 acres (all of which we hereafter refer to as the Farm), with an estimated total value of one million dollars. According to the

---

[1] For ease of reading, we will refer to the parties in this appeal with the same last name by their first names.

record, the Farm had been in Alice's family since 1912, Alice was born in the farmhouse, and Alice and Robert intended that the Farm remain in the Talmage family. In the 1970s, Alice and Robert added the log home to the property, which then became their primary residence. Robert died in 2007, but Alice remained living at the Farm until she moved to Montana in July 2018.

¶4 In 2006, Attorney Jennifer O'Neill prepared an extensive estate plan for Alice and Robert, consisting of two wills, powers of attorney, a marital property agreement, the Talmage Joint Revocable Trust (the trust), and a quit-claim deed to transfer the Farm to the trust. According to the terms of the trust, after Robert's death, the trust estate was to be divided into the "family trust" and the "survivor's trust." The survivor's trust would contain Alice's individual property, Alice's interest in any marital property that she and Robert owned, and the smallest fractional share of the remaining trust estate that would eliminate any tax upon Robert's death. The family trust, in contrast, would contain "the balance of the trust estate."

¶5 Under the survivor's trust, Alice was authorized to gift trust assets pursuant to Article IV.B. of the trust. That article provides:

> The surviving spouse or his or her agent may withdraw all or any portion of the survivor's trust in order to enable the surviving spouse to make gifts qualifying for the annual federal gift tax exclusion in effect from time to time or for any other reason. Withdrawals shall be made by a writing signed by the surviving spouse or his or her agent that specifically refers to this paragraph and that is delivered to the trustee during the surviving spouse's lifetime, either in person or by registered or certified mail. This writing may either direct the trustee to distribute the withdrawn property to the surviving spouse or to his or her agent or, for convenience, direct the trustee, acting as the agent for the surviving spouse, to distribute the withdrawn property directly to one or more persons identified in the writing. If all or a major portion of the survivor's trust is withdrawn, the trustee may retain sufficient assets to secure payment of liabilities lawfully incurred by the trustee in the

> administration of the survivor's trust, including the trustee's fees that have been earned, unless the trustee is indemnified to the trustee's satisfaction against loss or expense.

Thus, Article IV.B. required that any withdrawals be made in writing and refer to Article IV.B.

¶6 Upon Alice's death, any remaining survivor's trust assets were to be added to the family trust's assets. The terms of the family trust then provided that upon Alice's death, the family trust would be divided in equal shares to Steven and Dianne. Therefore, the terms of the family trust provided that the Farm would transfer to Steven and Dianne should they survive Alice and Robert. The family trust specifically excluded John from receiving a distribution, explaining that "[t]his exclusion is intentional and not the result of oversight" as Alice and Robert believed that John "has received a substantially equal share during his lifetime."

¶7 Under the terms of Alice's power of attorney, Robert was appointed as her attorney-in-fact, Steven was appointed as first alternate, and Dianne was second alternate. Thus, when Robert died in 2007, Steven became Alice's attorney-in-fact, and he held that position until November 6, 2018, when Alice appointed John as her attorney-in-fact.

¶8 In 2012, Attorney O'Neill again met with Alice, Steven, and Dianne to update Alice's estate plan. After the meeting, O'Neill drafted several documents: (1) a durable power of attorney for property and finances, which would have made Steven and Dianne co-agents; (2) two personal care agreements, which would have allowed Steven and Dianne to be paid as caretakers of Alice; and (3) a trustee's deed transferring the Farm from the trust to Steven and Dianne. O'Neill testified that she specializes in "medical divestment," which involves

individuals divesting themselves of "assets so that they can avail themselves later in life … of medical assistance benefits for provision of nursing care." According to O'Neill, when she drafted these documents, "there was no doubt in [her] mind that Alice … was considering medical assistance planning." However, none of these documents were ever executed.[2]

¶9 According to Alice's medical records, Alice began experiencing more frequent health problems in approximately 2014 to 2015. As a result, in June 2015, Dianne contacted Attorney Joseph Earley. At trial, Dianne testified that she did so because Alice told her that she "wanted to get [the Farm] out of her name because she didn't think she was gonna be around much longer or that she would be at home much longer" and that Alice wanted "[t]o transfer the property to me and Steve so that the [F]arm would be protected from future healthcare costs." Dianne's first contact with Earley's office stated that she wanted him to "review the estate planning documents that have already been done for my parents and make recommendations for finalizing a plan."

¶10 According to Earley, he met with Steven and Dianne on July 10, 2015, "to talk in general about Medicaid planning and specifically about their mom's situation."[3] He testified at trial that he was told Alice was not present at that meeting due to "health concerns [and] mobility issues," which Dianne

---

[2] O'Neill testified that after she sent the documents to Alice, her receptionist called Alice to schedule an appointment to sign the documents. According to O'Neill's records, "Dianne called the office back and said that Alice wasn't sure why we were calling and to please contact Dianne in the future." Dianne testified that Alice "had received at least two calls" from O'Neill's office, and Alice told Dianne to "make them stop calling me." Dianne explained that Alice "didn't like the meeting, she didn't like the proposal, she didn't want to follow through with it."

[3] The circuit court found that "[a]t that time, Steven was still Alice's attorney-in-fact and was authorized to retain attorneys on Alice's behalf."

5

corroborated during her testimony. As a result of that meeting, Earley drafted a trustee's deed to transfer the Farm to Steven and Dianne, which Earley sent to Dianne by e-mail on August 5, 2015.

¶11 On August 8, 2015, Alice fell in her home and was admitted to the hospital. She was hospitalized from August 8-17, 2015. During some of her hospitalization, Alice's medical records show that she was suffering from an "[a]ltered mental status" and confusion. By August 11, 2015, however, Alice's records state that she was "alert and oriented," and when she was released from the hospital on August 17, 2015, she was "less than 20% impaired, limited or restricted." On August 24, 2015, Steven accompanied Alice to a follow-up appointment with her doctor. The notes from that visit state that Alice was "[a]lert and oriented" and that she was "[c]ooperative" with "[n]ormal judgement."

¶12 That same day—August 24, 2015—Steven took Alice to meet with Earley at his office, Dianne met them there, and Alice signed the trustee's deed. Steven took a photograph of Alice and Earley after she signed the trustee's deed, which showed Alice in the car with Earley standing next to her holding the trustee's deed. The trustee's deed transferred the Farm to Steven and Dianne, each as tenants in common, but the deed did not reference Article IV.B. of the trust. The deed was recorded on September 14, 2015.

¶13 After transferring the property to Steven and Dianne, Alice resided in the log home on the Farm until July 2018, when she moved to Montana to live with John. This move was intended to be temporary, as the log home was to undergo much-needed repairs and updates while Alice was absent. Steven and Dianne testified that Alice had authorized $20,000 of her funds for these updates, but Alice claimed that she only authorized up to $7,000 to repair the floor, fix

water damage, and replace the carpet in the log home. Alice alleged that Steven and Dianne used additional funds and engaged in other acts of financial self-dealing, which John discovered after reviewing Alice's bank records. After Alice discovered Steven's self-dealing as her attorney-in-fact, she revoked her power of attorney and named John as her new attorney-in-fact on November 6, 2018.

¶14 On February 28, 2019, Alice, as both an individual and a trustee of the trust, filed the lawsuit at issue in this case. Alice's complaint alleged four counts: undue influence, lack of competency, conversion, and breach of fiduciary duty. She sought: (1) to void the trustee's deed; (2) an order requiring that the real estate be returned to the trust; (3) an accounting and a money judgment against Steven and Dianne for the money she alleged they converted; and (4) costs and attorney's fees. On March 22, 2019, Steven and Dianne answered the complaint. They alleged that the trustee's deed was a gift from Alice to Steven and Dianne and that all actions taken by them were known to or authorized by Alice.

¶15 The circuit court held a two-day bench trial on May 3 and 4, 2021, during which Alice, Steven, Dianne, John, Karen Ives (John's daughter), Earley, and O'Neill testified. At trial, Alice admitted that it was her signature on the deed, but she testified that she had no memory of meeting Earley or signing the document. Alice stated that she never intended to transfer the Farm out of the trust. In general, however, Alice struggled to remember many of the things she

was being questioned about, and at different points during the trial, the transcript demonstrates that Alice had verbal outbursts.[4]

¶16    On September 16, 2021, the circuit court issued its Findings of Fact, Conclusions of Law and Order for Judgment. The court concluded that the trustee's deed "constituted a completed gift of the [F]arm to Steven and Dianne" and that Alice failed to meet her burden to prove either that she lacked competency to sign the deed or that she signed the deed as a result of undue influence. The court also determined, however, that Steven owed Alice a fiduciary duty as Alice's attorney-in-fact and that Steven breached his duty "by gifting [money] to himself and self-dealing in Alice's cash assets." As a result, the court ordered a total money judgment in the amount of $34,049.69 in favor of

---

[4] In 2018, two of Alice's doctors signed a Determination of Incapacitation for Alice, which found Alice medically incapacitated such that she is "unable to receive and evaluate information effectively or to communicate decisions to such an extent that [she] lacks the capacity to manage [her] health care decisions."

Alice, finding Steven and Dianne jointly and severally responsible for $29,436.69 and Steven individually liable for $4,613.[5]

¶17 On October 5, 2021, Alice filed a motion for reconsideration on the ground that the trustee's deed did not satisfy the requirements of Article IV.B. of the trust, and therefore it was error for the circuit court to conclude that the deed was valid. The court denied the motion for reconsideration by order on November 5, 2021. On December 17, 2021, Alice filed her notice of appeal from both the September 16, 2021 judgment and the November 5, 2021 order denying her motion for reconsideration.

---

[5] The irregularities that the circuit court found credible were as follows: (1) "[o]n May 11, 2016, Steven transferred $10,000 from Alice's individual account to [an] account at First National Community Bank (FNCB) held jointly by Steven, Dianne and Alice," which "freed $10,000 of Alice's money from the terms and conditions of the financial power of attorney to allow him and Dianne to more easily manage Alice's finances"; (2) "[o]n September 1, 2016, Steve wrote a $1,000 check from the FNCB joint account to himself to open an account at Bremer Bank" in Steven's and Dianne's names, and "[t]he account collected Steven and Dianne's ongoing rental income from the [F]arm, and the account was used solely for Steven and Dianne's benefit"; (3) "[o]n September 14, 2016, Steven closed one of Alice's accounts and transferred the remaining balance of $6,557.14 to the FNCB joint account"; (4) "[o]n December 30, 2016, Steven wrote a check from the FNCB account to pay $2,214.50 toward the 2016 property taxes for the [F]arm," "[o]n December 28, 2017, [Steven also] wrote a check from the FNCB account to pay $2,398.50 toward the 2017 property taxes," and "[t]he tax payments advanced Steven and Dianne's interests because they owned the [F]arm"; (5) "[o]n August 7, 2018, Steven wrote a $20,000 check to himself for improvements to the log home" and "[h]e deposited those funds into the Bremer Bank account," but "Alice only authorized $7,000 of her funds"; (6) "[o]n October 10, 2018, Steven deposited in the FNCB account a $15,436.69 insurance claim check payable to Alice," which "related to an insurance claim for hail damage to the [F]arm"; and (7) "[o]n October 19, 2018, Steven wrote a $15,436.69 check to himself from the FNCB account" and "deposited it in the Bremer Bank account."

# DISCUSSION

## I. Jurisdiction

¶18 As an initial matter, Steven and Dianne argue that Alice "has forfeited the right to appeal the [circuit] court determinations that she had not met her burden of showing lack of capacity and that she had not shown that the [t]rustee's [d]eed was the product of undue influence," as she failed to timely appeal from the September 16, 2021 judgment. According to Steven and Dianne, Alice's appeal—filed ninety-two days after the September 16 judgment—was untimely, *see* WIS. STAT. § 808.04(1) (2021-22),[6] and on appeal she argued grounds that went beyond the sole issue raised in her motion for reconsideration.

¶19 In response, Alice invokes WIS. STAT. § 805.17(3), addressing trials to the court, which provides in pertinent part:

> **Reconsideration motions.** Upon its own motion or the motion of a party made not later than 20 days after entry of judgment, the court may amend its findings or conclusions or make additional findings or conclusions and may amend the judgment accordingly. The motion may be made with a motion for a new trial. If the court amends the judgment, the time for initiating an appeal commences upon entry of the amended judgment. If the court denies a motion filed under this subsection, the time for initiating an appeal from the judgment commences when the court denies the motion on the record or when an order denying the motion is entered, whichever occurs first.

According to Alice, the motion for reconsideration tolled the time for appeal from the September 16, 2021 judgment, and her notice of appeal was timely filed on December 17, 2021. Steven and Dianne disagree, arguing that under § 805.17(3),

---

[6] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

"the time for initiating an appeal is tolled only as to the issues that were raised in the motion for reconsideration."

¶20    We first note that the issue of whether Alice's notice of appeal was timely filed does not involve the question of forfeiture, as Steven and Dianne suggest.  The issue is whether Alice's notice of appeal was effective to give this court *jurisdiction* over the judgment and the order in this case.  *See* WIS. STAT. RULE 809.10(1)(e) (court of appeals lacks jurisdiction when an appeal is untimely filed).

¶21    Second, we agree with Alice that under WIS. STAT. § 805.17(3) and the circumstances of this case, her "motion for reconsideration operated to change the time limits governing" Alice's appeal.  *See **Salzman v. DNR***, 168 Wis. 2d 523, 526-27, 484 N.W.2d 337 (Ct. App. 1992).  Again, the operative dates in this case are as follows.  The circuit court entered its final judgment on September 16, 2021.  Alice filed her motion for reconsideration on October 5, 2021, and the court denied her motion on November 5, 2021.  On November 23, 2021, Steven and Dianne filed a notice of entry of the court's September 16 judgment and November 5 order.  On December 17, 2021, Alice filed her notice of appeal.

¶22    The trial in this case was a trial to the circuit court, so WIS. STAT. § 805.17(3) is clearly applicable under the circumstances.  *See **Continental Cas. Co. v. Milwaukee Metro. Sewerage Dist.***, 175 Wis. 2d 527, 533, 499 N.W.2d 282 (Ct. App. 1993).  Further, there is no argument that Alice's motion for reconsideration was not timely filed after the September 16, 2021 judgment.  *See* § 805.17(3) ("Upon its own motion or the motion of a party made not later than 20 days after entry of judgment ….."); ***Continental Cas. Co.***, 175 Wis. 2d at 535 ("We, therefore, conclude that [§] 805.17(3) … modifies the deadline for filing an

11

appeal only when a reconsideration motion has been timely filed after a trial to the court."). Thus, pursuant to § 805.17(3), the time for initiating an appeal from the September 16 judgment began to run on November 5, 2021, when the motion for reconsideration was denied. That deadline was then reduced from ninety days to forty-five days, by operation of WIS. STAT. § 808.04(1), when Steven and Dianne filed their notice of entry of judgment and order. However, "[t]he measurement of the forty-five-day time period … begins upon disposal of the motion for reconsideration as set forth under [§] 805.17(3)." *Salzman*, 168 Wis. 2d at 531 (footnote omitted). Accordingly, Alice was required to file her notice of appeal by December 20, 2021, and her filing on December 17, 2021, was therefore timely.

¶23 To the extent Steven and Dianne argue that "under WIS. STAT. § 805.17(3), the time for initiating an appeal is tolled only as to the issues that were raised in the motion for reconsideration," we disagree. Steven and Dianne do not provide any legal authority for their position, and we conclude that the plain language of the statute is not so limited. The statute states that when a motion for reconsideration under subsec. (3) is denied, the time for initiating an appeal "from the judgment" commences when the court denies the motion or enters an order denying the motion. This reference to an appeal "from the judgment" encompasses the entire judgment, not simply the time to appeal any issue raised in the motion for reconsideration. In short, the plain language of the statute does not support Steven and Dianne's reading, and we conclude that we have jurisdiction to consider all of the issues Alice raises on appeal.

## II. Standard of Review

¶24 Addressing the merits of Alice's appeal, Alice makes four arguments: (1) the circuit court erred by concluding that there was a valid transfer

of the Farm to Steven and Dianne; (2) the court erred by concluding that Alice did not prove undue influence; (3) the court erred by concluding that Alice was competent; and (4) the court erred by failing to include rental income, insurance premiums, and Dianne's towing expenses as part of the money judgment.

¶25    On these issues, following a bench trial, the circuit court's findings of fact will be affirmed unless they are clearly erroneous. WIS. STAT. § 805.17(2) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the [circuit] court to judge the credibility of the witnesses."). We further note that

> [w]hen a [circuit] court acts as the finder of fact, we will sustain its findings unless they are against the great weight and clear preponderance of the evidence. When more than one reasonable inference can be drawn from the evidence, this court is obliged to support the findings made by the [circuit] court.

*Herlitzke v. Herlitzke*, 102 Wis. 2d 490, 494, 307 N.W.2d 307 (Ct. App. 1981); *Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 249-50, 274 N.W.2d 647 (1979). We will search the record for evidence to support the findings that the circuit court made, not for findings that the court could have made but did not make. *Becker v. Zoschke*, 76 Wis. 2d 336, 347, 251 N.W.2d 431 (1977). It is for the circuit court, not this court, to resolve conflicts in the testimony. *See Fuller v. Riedel*, 159 Wis. 2d 323, 332, 464 N.W.2d 97 (Ct. App. 1990); *see also Cogswell*, 87 Wis. 2d at 250 ("In addition, when the trial judge acts as the finder of fact, and where there is conflicting testimony, the trial judge is the ultimate arbiter of the credibility of the witnesses.").

13

## III. Violation of Trust Terms

¶26 Alice first argues that the transfer of the Farm was not valid because the trustee's deed violated the terms of the trust. In her motion for reconsideration and on appeal,[7] Alice argues that the trust language in Article IV.B. clearly requires that in order to withdraw assets from the trust, the "[w]ithdrawals shall be made by a writing signed by the surviving spouse or his or her agent that specifically refers to this paragraph and that is delivered to the trustee during the surviving spouse's lifetime, either in person or by registered or certified mail." While the trustee's deed was in writing and signed by Alice, it is undisputed that the document did not reference Article IV.B. of the trust.

¶27 In response, Steven and Dianne argue that Alice both waived and forfeited[8] her right to assert this ground of noncompliance with the express terms of the trust. According to Steven and Dianne, this issue was not addressed in Alice's complaint, "there was no express or implied consent of the parties to try [Alice's] unpled, untechnical argument," and there was "no request by [Alice] that the pleadings be amended to conform to the proof presented at trial." In response, Alice argues that Steven and Dianne "had actual notice of the issue," as trial testimony addressed the issue of the technical requirements necessary for a valid transfer of assets out of the trust, and there were no objections made to either that

---

[7] We note, for the record, that an appeal cannot be taken from an order denying a motion for reconsideration that presents the same issues as those determined in the judgment or order sought to be reconsidered. *See Silverton Enters., Inc. v. General Cas. Co.*, 143 Wis. 2d 661, 665, 422 N.W.2d 154 (Ct. App. 1988). The parties do not argue that there is a *Silverton* concern here; therefore, we will address it no further.

[8] Waiver and forfeiture are two distinct legal concepts. Waiver is the intentional relinquishment of a known right, while forfeiture is the failure to make a timely assertion of that right and develop it. *See State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612.

testimony or to the issue being brought before the circuit court on reconsideration. Thus, Alice claims, Steven and Dianne impliedly consented to the court addressing the trustee's deed's lack of compliance with the trust terms. *See* WIS. STAT. § 802.09(2); *State v. Peterson*, 104 Wis. 2d 616, 634, 312 N.W.2d 784 (1981).

¶28  We will assume, without deciding, that Alice did not forfeit the issue of technical compliance with the express terms of the trust.[9]  The circuit court

---

[9] Alice also argues that the circuit court failed to determine in which trust the Farm was located.  After Robert's death, the terms of the original trust required the trustee to "divide the trust estate … and distribute it as principal into two new separate trusts, designated the 'family trust' and the 'survivor's trust.'"  Alice asserts that the court did not determine whether the Farm was in the family trust—which did not permit the gift of trust assets to third parties—or the survivor's trust—which allowed for such distribution.  Alice contends that because the court failed to determine how the trust assets were segregated upon Robert's death and, by extension, never determined whether the Farm was in the survivor's trust or the family trust, the issue of whether her gift of the Farm to Steven and Dianne violated the trust provisions has not yet been litigated, and this issue should be remanded to the court for determination.  The evidence shows that upon Robert's death, Alice was the sole trustee of the original trust.  Thus, according to the trust provisions, Alice was supposed to create the survivor's and family trusts.  There is no evidence in the record whether or not she created the separate trusts.

Our review of the record on appeal suggests that Alice did not address this question before the circuit court.  In fact, Alice's motion for reconsideration, which specifically argued that the trustee's deed did not comply with the terms of Article IV.B.—found under the provisions pertaining only to the survivor's trust—did not assert that the court failed to determine in which trust the Farm was located, nor did her motion request that the court do so. *See Bishop v. City of Burlington*, 2001 WI App 154, ¶8, 246 Wis. 2d 879, 631 N.W.2d 656 ("A litigant must raise an issue with sufficient prominence such that the [circuit] court understands that it is being called upon to make a ruling.").  Instead, Alice's reconsideration motion and her arguments on appeal appear to assume that the provision pertaining to the survivor's trust applies, meaning that she assumed that the Farm was located in the survivor's trust.  In fact, Alice's entire claim that the transfer of the Farm was not valid because the trustee's deed violated the terms of the trust rests on the assumption that Article IV.B. applies.  Further, Alice's argument that we should remand for the circuit court's determination is overall conclusory and undeveloped, *see State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992), and Steven and Dianne failed to address this issue in their response.  Given that we generally do not consider issues raised for the first time on appeal, *see Apex Elecs. Corp. v. Gee*, 217 Wis. 2d 378, 384, 577 N.W.2d 23 (1998), and that it appears that the parties litigated the matter assuming that the Farm was located in the survivor's trust, we will do the same.

determined that Article IV.B. of the trust did not require that Alice refer to Article IV.B. when distributing assets to a third party because she was both the surviving spouse and the trustee; thus, Alice's "failure to comply with Article IV.B. is, at most, a harmless, technical violation." We agree.

¶29 Here, Alice was the surviving spouse, the beneficiary, and the trustee under the trust. Thus, in essence, Alice is arguing that by failing to include a reference to Article IV.B. in the trustee's deed, Alice failed to give herself notice of the transfer. Alice was not required to give herself notice of an action she herself was taking. Further, we are unpersuaded by Alice's argument that the circuit court should have considered the "behind-the-scenes actions of Steven and Dianne with Attorney Earley in understanding the significance of including reference to Article IV.B. and why the violation was neither 'harmless' nor 'technical.'" Apart from conclusory statements, Alice fails to assert or develop an argument as to how or why the inclusion of a reference to Article IV.B. in the trustee's deed would have somehow revealed the "behind-the-scenes actions of Steven and Dianne" or "showed Alice knew the extent of what she was signing."

## IV. Undue Influence

¶30 Alice next argues that the circuit court erred by concluding that she did not prove the existence of undue influence. There are two methods by which Alice could prove undue influence: the four-element test and the two-element test. *See Hoeft v. Friedli*, 164 Wis. 2d 178, 184-85, 473 N.W.2d 604 (Ct. App. 1991); *see also First Nat'l Bank of Appleton v. Nennig*, 92 Wis. 2d 518, 536, 285 N.W.2d 614 (1979) ("Undue influence in the execution of an inter vivos conveyance is proved in the same way that undue influence is proved in the execution of a will."). The four-element test requires an objector to

16

prove: "(1) susceptibility to undue influence, (2) opportunity to influence, (3) disposition to influence, and (4) coveted result." *Hoeft*, 164 Wis. 2d at 185. "When the objector has established three of the four elements by clear and convincing evidence, only slight evidence of the fourth is required." *Id.*

¶31    The two-element test requires an objector to prove: "(1) a confidential or a fiduciary relationship between the [grantor] and the favored beneficiary, and (2) suspicious circumstances surrounding" the transfer of property. *See id.* at 184. "When the objector proves the existence of both elements by clear and satisfactory evidence, a rebuttable presumption of undue influence is raised." *Rahr v. East Wis. Tr. Co.*, 88 Wis. 2d 199, 219, 277 N.W.2d 143 (1979) (footnote omitted). The objector may rely on either or both tests to attempt to prove undue influence, and Alice appears to rely upon both tests here.[10] *See Hoeft*, 164 Wis. 2d at 185.

¶32    We agree with the circuit court that Alice failed to meet her burden to prove that she signed the trustee's deed as a result of undue influence. The court concluded that "the evidence show[ed] that Alice made an inter vivos gift

---

[10] Although Alice mentions the two-part test, her arguments on this point are conclusory and overall undeveloped. Steven's role as attorney-in-fact for Alice appears to satisfy the first element of the test that there be a "confidential or a fiduciary relationship." *See Hoeft v. Friedli*, 164 Wis. 2d 178, 184, 473 N.W.2d 604 (Ct. App. 1991). On the second element, Alice identifies "suspicious circumstances" regarding her hospitalization while Steven and Dianne coordinated the trustee's deed through Attorney Earley. *See id.* For example, Alice claims that she was "kept out of the loop with Attorney Earley"; that it was suspicious that Steven insisted on taking a photograph of the signing of the trustee's deed; and that there was "vastly conflicting testimony from Attorney Earley, Steven, and Dianne regarding the signing." The circuit court specifically found Steven's and Dianne's testimony regarding the August 24, 2015 meeting to be credible, noting that Earley "did not have a present recollection about most of the meeting." Further, Alice also appears to argue that Dianne contacting Earley was somehow improper or suspicious because Earley was Dianne's high school classmate. However, Dianne testified that she contacted Earley on a recommendation from Alice's accountant. Further, both Dianne and Earley testified that they had not been friends in high school or had significant contact after high school.

17

that was consistent with the objectives of her existing estate plan to ultimately transfer the [F]arm to Steven and Dianne." While Steven and Dianne may have had the opportunity to influence Alice, the clear and convincing evidence does not establish that Alice was "unusually receptive to the suggestions of others," *see Johnson v. Merta*, 95 Wis. 2d 141, 156-57, 289 N.W.2d 813 (1980), or that Steven and Dianne had "more than just a desire to obtain a share of [Alice's property]" but instead had "a willingness to do something wrong or unfair," *Onderdonk v. Keepman*, 81 Wis. 2d 687, 700, 260 N.W.2d 803 (1978).

¶33    In support of her position that she was susceptible to undue influence, Alice cites her hospital stay in August 2015 and the fact that "Alice's trial testimony revealed she did not remember much, if anything, that happened from August 9, 2015[,] through August 24, 2015." As noted above, however, there was contradictory evidence presented regarding Alice's mental status during the course of her hospital stay, and the circuit court found that Alice's medical records showed that she had recovered from any temporary mental incapacity during her hospitalization. Further, given that Alice was found to be medically incapacitated in April 2018, her inability to remember events that occurred in 2015 at the trial in 2021 provides little support for her position. At the same time, because Alice was not found medically incapacitated until 2018, her subsequent incapacitation does not support a finding that she was "unusually receptive to the suggestions of others" in 2015.

¶34    Further, we agree with Steven and Dianne that Alice's signing of the trustee's deed was not an unnatural or a coveted result. A coveted result "has been said to signify more than simply a result favorable to the person who is alleged to have exerted undue influence." *Merta*, 95 Wis. 2d at 159. "This element goes to the naturalness or expectedness of the conveyance." *Onderdonk*, 81 Wis. 2d at

18

700. "Even a [conveyance] which evidences a drastic change in attitude can be sustained if logical reasons are shown for that change." *Odegard v. Birkeland*, 85 Wis. 2d 126, 138, 270 N.W.2d 386 (1978).

¶35 The only difference between Alice and Robert's original trust documents and the trustee's deed conveying the property was that the transfer occurred sooner—within Alice's lifetime—rather than at her death.[11] While this result is, as Alice described it, "ahead of what Robert and Alice intended" at the time they created the trust, and while Alice is denied the benefit of owning the property during this period, Alice also receives the benefit of protecting the property from a medical or nursing care lien. While this protection additionally inured to the benefit of Steven and Dianne, it also served Alice's interest in keeping the Farm in the family. Steven and Dianne did not obtain anything other than what was expected, as they would have received the Farm under the existing estate plan upon Alice's death. Thus, their actions were not clearly "wrong or unfair." *See Onderdonk*, 81 Wis. 2d at 700.

¶36 To the extent the trustee's deed could be called a "drastic change in attitude," testimony revealed that Alice was motivated by medical assistance planning. *See Odegard*, 85 Wis. 2d at 138. Dianne testified that she had discussions with Alice regarding the Farm, and Alice expressed her desire to

---

[11] Alice argues, however, that "receipt of the Farm is now unjust to other beneficiaries" because under Article V.B. of the trust, if Dianne should predecease Alice, then the Farm was to be split amongst Steven's and John's children. Alice claims that "Steven and Dianne used the trustee's deed to circumvent Robert and Alice's intent and destroy the objects of Robert and Alice's estate plan by cutting Steven['s] and John's kids out and transferring the Farm many years in advance." We disagree. The clear intent of Robert and Alice was that Steven and Dianne would receive the Farm, and it was only upon the condition that Dianne predeceased the distribution of the trust that the children of Steven and John would receive anything.

transfer the property to protect it in the future due to her increasing medical issues. Further, Attorney O'Neill testified that Alice was considering medical assistance planning in 2012.

¶37     The circuit court believed that Alice's transfer of the Farm to Steven and Dianne was something that she wanted to do at the time to avoid losing the Farm should something happen with her health in the future.  While Alice highlights the evidence that is most favorable to her on appeal, her arguments merely ask us to reweigh the evidence, which we are unable to do under our standard of review.  The court's decision was properly supported by evidence in the record that was found by the court to be credible.  We therefore agree with the court and conclude that Alice failed to meet her burden to prove that she signed the trustee's deed as a result of undue influence.

*V. Competency*

¶38     Alice also argues that the circuit court erred by concluding that Alice was competent when she signed the trustee's deed on August 24, 2015.  She claims that the trustee's deed is void because she was not competent to sign it at that time.  "Wisconsin has long recognized a cause of action to rescind a contract or conveyance based upon the lack of mental competency at the time of the transaction."  *Hauer v. Union State Bank of Wautoma*, 192 Wis. 2d 576, 588, 532 N.W.2d 456 (Ct. App. 1995).  However, "[t]he law presumes competency rather than incompetency; it will presume that every person is fully competent until satisfactory proof to the contrary is presented."  *Nennig*, 92 Wis. 2d at 529-30.  The party seeking to void the contract or conveyance bears the burden to prove incompetency.  *Hauer*, 192 Wis. 2d at 589.  "The test of competency is, did the person involved have sufficient mental ability to know what he [or she] was

20

doing and the nature of the act done." *Nennig*, 92 Wis. 2d at 530. "Almost any conduct may be relevant, as may lay opinions, expert opinions and prior and subsequent adjudications of incompetency." *Hauer*, 192 Wis. 2d at 590.

¶39 We conclude that the circuit court properly determined, based on ample support in the record, that Alice failed to meet her burden to establish that she was incompetent when she signed the trustee's deed. Specifically, the court found:

> None of the medical records near the time she executed the deed showed that she was incompetent. Although Alice had moments of confusion, the records showed no history of neurological impairments or diagnoses. There was no sign that Alice's healthcare directive was activated or that Alice was unable to make her own medical decisions. Significantly, in the treatment note from the August 24, 2015 visit, her provider reported that Alice was "alert and oriented," was "cooperative," and showed signs of "normal judgement." Immediately after this visit, Alice went to Attorney Earley's office and signed the deed.

The court further found that after the August 24, 2015 meeting, "Earley's office received a check signed by Alice for payment of legal services in connection with the preparation of the trustee's deed."

¶40 The circuit court unequivocally determined that Alice was competent when she executed the trustee's deed. The court's finding is supported by evidence in her medical records that any confusion or mental impairment that Alice experienced upon entering the hospital had resolved by the end of her

hospital stay.[12]  On the day she signed the trustee's deed, her doctor reported that Alice had an appropriate mental state.  Further, Earley testified that he made an assessment of Alice that day, and he determined that Alice "knew that she was signing a deed," that she "wanted to sign a deed," and that he had no "impression" when he met with Alice that "she lacked capacity to sign a deed."

¶41     On appeal, Alice argues that the record is clear that she "was dealing with lingering mental confusion throughout the month of August 2015."  Again, Alice's arguments focus on testimony that was favorable to her, but the circuit court's findings on this question were sufficiently supported by evidence in the record.  Alice also argues that her incompetence was demonstrated by her need for assistance with her daily living.  The record revealed, however, that she was living alone in August 2015 and that Steven and Dianne assisted her with only general errands and tasks.  Alice further claims that it is clear that she did not know that she was signing the trustee's deed because she believed that she still owned the Farm, and she continued to make the insurance premium payments.  Steven testified, however, that Alice stated to him that while she was living in the house, she wanted to pay the insurance bill.  Alice also claims that she never spoke to Earley about the trustee's deed, read the trustee's deed, reviewed the trustee's deed

---

[12] Despite the evidence to the contrary relied upon by the circuit court, Alice disagrees that she improved during her time in the hospital.  She points out that at trial, Ives—who is Alice's granddaughter, John's daughter, and who is also a registered nurse—testified that she visited Alice at the hospital for approximately fifteen to twenty minutes on August 16, 2015.  Ives reported that Alice's "speech was nonsensical, very disorganized.  She wasn't sure where she [was], why she was there, really who I was.  She kept repeating herself often and was very confused."  Further, John testified that he called Alice on August 18, 2015, and he "spent a long time trying to convince her I wasn't her dead husband," Robert.  Additionally, Alice claims that a discharge summary completed on August 19, 2015, concluded that Alice still had a "[g]uarded" prognosis; however, the "admission diagnosis" on that document listed "[w]eakness" as the main concern, not anything pertaining to Alice's mental status.  (Formatting altered.)  On that point, Dianne testified that "guarded" was "in terms of the fall factor."

with counsel, or considered the trustee's deed with the rest of her existing estate plan. As noted above, however, Earley testified that his assessment, when he met Alice on August 24, 2015, was that she "wanted to sign a deed." Dianne also testified that Alice told her that she wanted to sign the deed to protect the Farm from being taken to pay for possible future nursing home expenses.[13]

¶42  In general, Alice claims that the circuit court should not have considered testimony contrary to her position. In particular, Alice argues that Earley's "alleged competence assessment on August 24, 2015[,] should have been [given] zero weight by the [circuit] court" because he did not have sufficient time with Alice to evaluate her properly. Alice also argues that the court's decision to find Steven or Dianne credible was erroneous "considering the fact the [circuit] court found Steven and Dianne were thieves." These credibility determinations, however, were within the province of the circuit court. *See* WIS. STAT. § 805.17(2). The court weighed the credibility of the witnesses in its findings and upheld the validity of the trustee's deed, finding Alice competent at the time she signed it. Given both the presumption that a person is competent and the evidence presented at trial, we see no error.

---

[13] Alice notes in her briefing that "contrary to the [circuit] court's finding that the [t]rustee's [d]eed was made to shield against nursing home expenses, the [r]ecord showed that there was no real effort taken to protect the Farm from nursing home expenses" and that "Steven admitted he never even looked into nursing home care until roughly three years after the transfer." However, the timing of *when* either Steven or Dianne actually began investigating nursing home care for Alice appears to be irrelevant, given that trial testimony revealed that there was a "federal lookback period" for transfers "of property without consideration within five years of making an application for medical assistance." Thus, the point of "medical assistance planning" appears to be that the transfer should take place well *before* Alice might have needed nursing home care.

## VI. Money Judgment

¶43 The circuit court granted Alice a money judgment in the amount of $34,049.69. It found that Steven breached his duty as attorney-in-fact and that Steven and Dianne's actions contributed to a conversion of Alice's money. On appeal, Alice challenges the court's award, arguing that "there are a number of monies the [circuit] court did not award as part of its judgment for Alice that were converted by Steven and Dianne." In particular, Alice points to rental income received from the Farm after August 24, 2015. As we concluded above, however, the court properly determined that the trustee's deed was valid and that Steven and Dianne owned the Farm after the date it was signed. Therefore, Alice is not entitled to rental income subsequent to that date, and the court properly refused to award those funds in the judgment against Steven and Dianne.

¶44 Alice next argues that she was "made to pay [insurance] premiums on the Farm despite no longer owning the Farm." In particular, she argues that she paid $1,088 on October 12, 2015, and $1,191 on September 29, 2016, for the premiums. It is true that the circuit court did not award those amounts to be returned to Alice, but it did order that $15,436.69 in insurance proceeds be returned to Alice from a "hail damage" claim to the Farm. The court explained that

> [a]lthough Alice did not own the Farm when the hail damage occurred, she was the policyholder and she paid the premiums. As such, she was rightfully entitled to insurance proceeds because insurance is a contract between the insurer and the insured. Steven and Dianne have no interest in the insurance contract or the proceeds from the claim.

Thus, had the court also awarded Alice's payments for the insurance premiums returned to her, she would have received a windfall. The court properly

determined that Alice was not entitled to both the insurance proceeds and the insurance premiums, as her payment of the insurance premiums entitled her to the insurance proceeds. Apart from arguing that this determination "was erroneous," Alice cites no legal authority in support of her position.

¶45 Finally, Alice argues that the circuit court should have awarded her the funds that Dianne used to tow Alice's car. Dianne testified that she got into an accident with Alice's car and paid for the towing—in the amount of $414.09—with Alice's money from a joint account. Alice argues that "Dianne never should have had access to the funds in the first place" because she was not the attorney-in-fact and that "there was no evidence suggesting Alice consented." We disagree.

¶46 According to Dianne's trial testimony, Alice "offered to pay" the cost to tow the vehicle. In contrast, it does not appear that Alice was asked at trial about whether she gave Dianne permission to use her funds to pay to tow Alice's vehicle; thus, there was no testimony contradicting Dianne's explanation. Given Dianne's testimony, the circuit court's decision not to include the towing costs in the final money judgment was not clearly erroneous.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.